**Albert E. ALBERTSON,**
**Plaintiff-Appellant,**

v.

**T.J. STEVENSON & COMPANY, INC.**
**Defendant-Appellee.**

No. 83–2394.

United States Court of Appeals,
Fifth Circuit.

Dec. 26, 1984.

Sanders & Sanders, Stephen D. Sanders, Waldman & Smallwood, Beaumont, Tex., for plaintiff-appellant.

Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Mark Freeman, Bruce Partain, Beaumont, Tex., T.E. Willoughby, Jr., New York City, for defendant-appellee.

Before RANDALL, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

In this case, Albert E. Albertson challenges the district court's grant of T.J. Stevenson & Co.'s (Stevenson) motion for summary judgment. The district court concluded that Albertson's cause of action under the Jones Act, 46 U.S.C. § 688 (1982), was time-barred, because Albertson knew he was injured while on board Stevenson's freighter but failed to file suit within three years after returning to shore. *Id.*; 45 U.S.C. § 56 (1982). The court also held that Albertson's remaining cause of action for unseaworthiness was barred by the equitable doctrine of laches. We conclude that the district court applied the correct legal standard for determining when Albertson's Jones Act and unseaworthiness causes of action accrued. As no genuine issue of material fact exists, we affirm the summary judgment.

## I.

In granting Stevenson's motion for summary judgment, the district court derived the undisputed material facts from three sources: Albertson's deposition, his affidavit, and the affidavit of Stevenson's vice-president. The principal source of the undisputed material facts was Albertson's deposition. That deposition revealed that between November 1968 and February 1969 Albertson served as an electrician on board the S.S. ST. JOAN, an ocean-going freighter operated by Stevenson. Albertson's duties included maintenance and regular cleaning of certain parts of the electrical apparatus on board the ship. After cleaning this electrical apparatus, he applied with a spray gun a chemical solution composed of 60% mineral spirits and 40% trichloroethylene (TCE). The solution was used to absorb moisture on the electrical contacts in order to enhance electrical conductivity.

Albertson claims he sustained injury during a voyage aboard the S.S. ST. JOAN, because there was an insufficient supply of mineral spirits on board. Albertson asserts that it was necessary for him, therefore, to apply the TCE undiluted. The vessel also was not equipped with spray masks, so he was required to spray the chemical without any facial or respiratory protection. Albertson testified in his deposition that although he had used TCE at various times during the eighteen months prior to this voyage he had never applied the TCE either at full strength or without a spray mask. He also confirmed that he knew TCE was a dangerous chemical requiring special precautions and that a label on some of the TCE canisters warned against prolonged use of the chemical as creating a potential for liver damage.

While using the undiluted TCE during the four-month voyage, Albertson lost consciousness and experienced severe headaches on five or six occasions. The last episode in which he lost consciousness was the most severe, requiring the administration of minor medical care. After his last blackout, Albertson told his superiors that he would not apply the TCE again. He testified that strong pain medications failed to allay the excruciating headache and nausea he endured for the remainder of the voyage.

Within approximately two months after the S.S. ST. JOAN arrived at its home port in Jacksonville, Florida, in February 1969, Albertson visited the United States Public Health Service Clinic in Jacksonville for the treatment of his continuing headaches, nausea, and periodic blackouts. He met with Dr. Morris, the director of the Jacksonville clinic. Dr. Morris apparently was unable to help him. Within a few weeks after their initial meeting, Dr. Morris referred Albertson to Dr. Miller, a psychiatrist. Dr. Miller admitted Albertson to the psychiatric ward of a local hospital for observation and treatment. During the four-week period in which Albertson remained in the hospital, he attended group therapy sessions and was treated with a variety of medications. He also was given an EEG, which revealed an abnormal brain wave pattern. The record does not establish whether Albertson knew at that time that his EEG was abnormal. In fact, when Albertson was asked at his deposition whether any doctor in 1969 revealed a diagnosis to him, he claimed that none had done so.[1]

Albertson's doctors discharged him from the hospital in the late spring of 1969. Because of Albertson's poor medical condition, however, Dr. Morris would not certify him as being fit for sea duty, so Albertson never served on board a vessel again. During the summer of 1969 Albertson continued to experience headaches, and red blisters began appearing on his hands, although no physician ever told him the cause of the blisters.

Approximately a year after he returned from this voyage, members of his family began to complain of changes in his behavior and personality. Between the summer of 1969 and November 1972, Albertson experienced blackouts, nausea, and hallucinations, and he began hearing voices. In his deposition, he testified that by late-1972 the hallucinations he experienced and the voices he heard tortured him to such an extent that he attempted to rid himself of the torment by shooting himself in the head. He recovered from two brain operations, although grand mal epileptic seizures which he still experiences are attributable to the trauma sustained from the self-inflicted gunshot wound.

From 1972 to 1979 Albertson was committed at various times to several hospitals. Albertson's deposition does not reveal whether he was committed for the treatment of mental or physical problems. In 1978 or 1979 blisters similar to those that had appeared in 1969 resurfaced. This time, however, the blisters were more severe; they turned into lesions, and after the lesions healed, scars remained. He claims that the physicians treating him never discovered the cause of the blisters. In fact, Albertson claims that until 1980 no doctor had ever told him either what was wrong with him or what caused his illnesses. Sometime in 1980, however, Dr. Miller informed Albertson that a causal connection probably existed between Albertson's exposure to the TCE in 1969 and the psychological problems he subsequently experienced.

Albertson filed this suit on July 17, 1981, over twelve years after he was exposed to the TCE. His complaint alleged that as a result of the exposure to undiluted TCE while on board the S.S. ST. JOAN, he sustained encephalopathy[2] with resulting

---

**1.** Albertson asserts that just recently, in 1982 or 1983, his son, who was only fourteen in 1969, reported to him that in 1969 Doctors Miller and Morris had diagnosed Albertson as a schizophrenic.

**2.** Encephalopathy is defined as any disease of the brain and may be caused by such factors as

schizophrenia and physical and mental anguish. In response to Stevenson's motion for summary judgment, Albertson asserted by way of an affidavit that he was suffering from a liver ailment allegedly caused by his exposure to TCE. Yet, nowhere in his complaint did he allege that he suffered from any liver disorder. At his deposition, which had been taken eighteen months after this suit was filed, Albertson stated that no doctor had ever conducted an examination of his liver, attributed any liver problem to Albertson's exposure to TCE, or diagnosed him as suffering from cirrhosis of the liver.

In support of its motion for summary judgment with respect to the unseaworthiness issue, Stevenson submitted the affidavit of one of its vice-presidents. That affidavit revealed that Stevenson had a policy of destroying all records, logs, and other reports that were more than ten years old and that all such documents relating to the 1968–1969 voyage of the S.S. ST. JOAN had been destroyed prior to Albertson's initiation of this suit. Albertson did not challenge this affidavit.

In granting Stevenson's motion for summary judgment, the district court stated that Albertson knew he had been exposed to TCE, that Albertson had been injured as a result of this exposure, and that Albertson knew his exposure to TCE injured him. With respect to Albertson's Jones Act claim, the court concluded that the three-year statute of limitations began to run in February 1969. The court further held that laches barred Albertson's unseaworthiness claim.

## II.

■ The broad question in this appeal is whether the district court properly relied upon untimeliness in granting Stevenson's motion for summary judgment with respect to the Jones Act and general maritime claims. Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the burden of establishing the absence of any disputed material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists. *Russell v. Harrison*, 736 F.2d 283, 287 (5th Cir.1984). Thus, the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony. *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980). *See also Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984); *Vanlandingham v. Ford Motor Co.*, 99 F.R.D. 1, 3 (N.D.Ga.1983).

## A. THE JONES ACT CLAIM

■ Actions under the Jones Act are governed by the three-year statute of limitations applicable to claims brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 52–60 (1982). *Engel v. Davenport*, 271 U.S. 33, 35, 46 S.Ct. 410, 411, 70 L.Ed. 813 (1926). The statute of limitations applicable to Jones Act and FELA claims is set out at 45 U.S.C. § 56, which in pertinent part states:

> No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued.

■ It is generally accepted that a cause of action for a tort accrues when there has been an invasion of the plaintiff's legally protected interest. *See* Restatement (Second) of Torts § 899 comments c & e (1977). Ordinarily, this invasion occurs at the time the tortious act is committed. *Id.*; *DuBose v. Kansas City Southern Railway*, 729 F.2d 1026, 1028 (5th Cir.), *cert.*

trauma or organ disfunction. *Stedman's Medi-* *cal Dictionary* at 458 (23rd ed. 1979).

*denied*, —— U.S. ——, 105 S.Ct. 179, 83 L.Ed.2d 113 (1984). If some injury is discernible when the tortious act occurs, the time of event rule respecting statutes of limitations applies, and the plaintiff's cause of action is deemed to have accrued. If the plaintiff later discovers that his injuries are more serious than originally thought, his cause of action nevertheless accrues on the earlier date, the date he realized that he had sustained harm from the tortious act.[3]

▓▓▓ In some cases, however, the injured person may not realize that a tort has been committed upon his person, since he may sustain a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred and after the applicable statute of limitations otherwise would have run. In such a case, courts have routinely applied the so-called discovery rule to toll the running of the statute of limitations. When the discovery rule applies, the plaintiff's cause of action does not accrue on the date the tortious act occurred, but on the date the plaintiff discovers, or reasonably should have discovered, both the injury and its cause. *United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259 (1979) (Federal Tort Claims Act case). *See also Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949) (FELA claim does not accrue until the injury manifests itself). In *DuBose v. Kansas City Southern Railway*, we recently applied *Kubrick* in an FELA case and held that "the discovery rule ... should be applied in federal cases whenever a plaintiff is not aware of and has [had] no reasonable opportunity to discover the *crit-*

*ical facts* of his injury and its cause." 729 F.2d at 1030 (emphasis added).

In this case, Albertson undertakes to characterize his injury as a typical latent injury and urges us to apply the discovery rule to toll the Jones Act statute of limitations. Although he acknowledges he suffered headaches, blackouts, and nausea immediately after being exposed to the TCE and that he knew his exposure to the TCE caused these problems, Albertson argues that latent and allegedly much more severe injuries to his brain, liver, and skin were discovered long after the statutory limitations period had expired. He argues that the discovery rule was designed to preserve claims such as his.

Stevenson answers that the time of event rule rather than the discovery rule applies in this case, since Albertson knew his legally protected interest had been invaded the moment he was first harmed by his exposure to TCE, the moment he experienced his first debilitating headache or blackout. Stevenson asserts that Albertson at that time had sufficient notice that a tort had been committed upon him. Stevenson argues that the mere fact Albertson's injuries were more severe than originally thought is not controlling, since a plaintiff cannot delay filing suit until the full extent of his injuries becomes known.

Our task is to determine when Albertson became aware of or had a reasonable opportunity to discover the critical facts of his injury and its cause. *DuBose*, 729 F.2d at 1030. The cases examined fall into two general categories: the pure latent injury case and the traumatic event/latent manifestation case.

---

**3.** In addition to affecting the accrual of a cause of action, the application of the time of event rule may indirectly affect the damages recoverable by the plaintiff. When the time of event rule applies, the plaintiff is required to assert and entitled to recover all of the elements of his past, present, and future harm attributable to the defendant's tortious conduct. Restatement (Second) of Torts § 910 (1977). To recover for future harm, the plaintiff must prove the likelihood of future harm, and if his proof is merely speculative, he may not recover for any later

revealed consequences of the tort. *Id.* § 912 & comment e (1977). If the plaintiff delays filing suit until the full extent of his injuries is known, he risks dismissal of his suit, since the applicable statute of limitations ordinarily is not tolled. Similarly, a plaintiff may not split his cause of action and institute one suit for the damages attributable to past and present harm and institute a second suit to recover for future damages when the full extent of the future damages becomes known. Restatement (Second) of Judgments § 24 (1982).

## 1. The Pure Latent Injury Case

 The pure latent injury case ordinarily arises in one of three situations: a suit by a worker who contracts an occupational disease, a medical malpractice suit by a patient who discovers an injury long after the negligent medical treatment has been administered, or a product liability suit by a consumer of a drug or other medically related product who discovers a side effect from the use of the defendant's product. In each of the pure latent injury cases, the plaintiff fails to discover either the injury or its cause until long after the negligent act occurred.

The discovery rule was initially articulated and has had its greatest acceptance in the occupational disease case. Because of the nature of the disease, the worker typically does not realize he has been injured until years after he was initially exposed to the substance causing the disease. In the leading case of *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), a train worker contracted silicosis, a pulmonary disease, from the continuous inhalation of silica dust over a period of thirty years. The worker became aware of his occupational disease only after he was unable to work, and he sued his employer shortly thereafter. The employer pled the FELA three-year statute of limitations as a defense. The Supreme Court rejected the defense, reasoning that in enacting the FELA Congress did not intend to charge an innocent plaintiff with knowledge of facts which are "unknown and inherently unknowable." *Id.* at 169, 69 S.Ct. at 1024. The Court recognized that since the purpose of the statute of limitations was to ensure prompt vindication of known rights, that purpose was ill-served where the employee was unaware that his legal rights were invaded. Accordingly, the Court held that an employee continuously exposed to a toxic substance over a period of time is " 'injured' only when the accumulated effects of the deleterious substance manifest themselves." *Id.* at 170, 69 S.Ct. at 1025.[4]

In *United States v. Reid*, 251 F.2d 691 (5th Cir.1958), we applied *Urie* to a medical malpractice claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2401, 2671–2680 (1982).[5] In that case, a physician misread x-rays and negligently informed his patient, Reid, that nothing was wrong with him. The x-rays actually should have revealed to the physician that Reid was suffering from incipient tuberculosis. After his condition had degenerated substantially over the next year, Reid was informed by another physician that he had tuberculosis. After another year, now over two years after the first physician negligently diagnosed Reid's condition, Reid sued the government. He claimed that the physician's negligence caused his condition to deteriorate. Relying upon *Urie*, we rejected the government's argument that the two-year statute of limitations applicable to FTCA claims barred Reid's suit. We determined that Reid's physical condition was the product of a period of time rather than a particular time, and held that Reid was " 'injured' only when the accumulated effects of the deleterious substance manifest[ed] themselves." *Id.* at 691 (quoting *Urie*, 337 U.S. at 170, 69 S.Ct. at 170).[6]

---

**4.** *See also Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1102 (5th Cir.1973) (diversity case construing Texas law; discovery of asbestosis), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). *Accord*: *Neubauer v. Owens-Corning Fiberglas Corp.,* 686 F.2d 570, 572 (7th Cir.1982) (diversity case construing Wisconsin law; discovery of asbestosis), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983); *Williams v. Borden, Inc.,* 637 F.2d 731, 735 (10th Cir.1980) (diversity case construing Oklahoma law; discovery of polyvinyl chloride poisoning); *Karjala v. Johns-Manville Prods. Corp.,* 523 F.2d 155, 160 (8th Cir.1975) (diversity case construing the Minnesota law; discovery of asbestosis); *Young v. Clinchfield R.R.,* 288 F.2d 499, 502 (4th Cir.1961) (FELA case; discovery of silicosis).

**5.** We have repeatedly applied the same standard for the accrual of claims brought pursuant to the FELA, FTCA, or 42 U.S.C. § 1983. *Lavellee v. Listi,* 611 F.2d 1129, 1131 n. 4 (5th Cir.1980) (citing cases); *United States v. Reid,* 251 F.2d 691, 693 (5th Cir.1958).

**6.** *See also Harrison v. United States,* 708 F.2d 1023, 1027 (5th Cir.1983); *Beech v. United States,* 345 F.2d 872, 874 (5th Cir.1965); *Quin-*

The final pure latent injury case in which the discovery rule is routinely applied is a product liability case against producers of drug or other products with potential for later development of physical injury. In *Mann v. A.H. Robins Co.*, 741 F.2d 79 (5th Cir.1984), for example, the plaintiff was fitted with an intrauterine device manufactured by the defendant. A year later she became pregnant but miscarried. Shortly thereafter, the device was removed, but she began experiencing pain in her lower abdomen. Sixteen months later her doctor diagnosed endometriosis and performed a total hysterectomy. Over eight years later, eleven years after she had been fitted with the device, she discovered a possible causal link between the defendant's product and her injuries, and she instituted suit. The district court applied Texas's two-year statute of limitations for personal injury actions and granted Robins's motion for summary judgment. We reversed and remanded, holding that the Texas discovery rule applied to a product liability case and tolled the accrual of a cause of action until the plaintiff both knew that she had been injured and knew or reasonably should have known the cause of her injury.[7]

In each of the pure latent injury cases set out above, the plaintiffs were victims of postponed awareness of their injury, the cause of their injury, or both their injury and its cause. Logic and sound jurisprudence mandate the conclusion that a plaintiff's cause of action does not accrue under these circumstances until the injury and the cause are knowable. This conclusion merely reflects the reluctance of courts to charge plaintiffs who had no indication that they were victimized by a tortfeasor with knowledge of what the Supreme Court characterized over forty-five

years ago as the "unknown and inherently unknowable." *Urie*, 337 U.S. at 169, 69 S.Ct. at 1024.

Albertson's case is different from these typical cases in which the discovery rule is applied. Albertson knew both that he was injured and the cause of his injury at the time of the injury in 1969. After his last exposure to the TCE, Albertson lost consciousness, was administered minor medical care, and endured an excruciating headache for the duration of the voyage. He informed his superiors that he would not apply the TCE again, indicating his awareness of the cause of his injury. His medical condition was so severe after he returned to land that he was soon thereafter decertified as being fit for sea duty, and he never served on board a vessel again. These facts make clear that Albertson's is not a pure latent injury case. The discovery rule cannot justify his failure to file suit for over twelve years.

### 2. The Traumatic Event/Latent Manifestation Case

We find Albertson's case is more appropriately analyzed as a traumatic event/latent manifestation case. A traumatic event/latent manifestation case is one in which the plaintiff has sustained both immediate and latent injuries caused by a noticeable, traumatic occurrence. At the time of the traumatic event, the plaintiff realizes both that he is injured and what is responsible for causing the injury. The full extent of the harm, however, has not become manifest.

In *Beech v. United States*, 345 F.2d 872 (5th Cir.1965), we addressed the issue of whether a claim accrued under the FTCA at the time the plaintiff in that case

---

ton v. United States, 304 F.2d 234, 240 (5th Cir.1962). *Accord*: *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir.1983); *Davis v. United States*, 642 F.2d 328, 330 (9th Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1273, 71 L.Ed.2d 459 (1982); *Zeidler v. United States*, 601 F.2d 527, 529 (10th Cir.1979); *Stoleson v. United States*, 629 F.2d 1265, 1269 (7th Cir.1980).

7. *See also Roman v. A.H. Robins Co.*, 518 F.2d 970, 971 (5th Cir.1975) (diversity case applying Texas law). *Accord*: *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 883 (9th Cir.1983) (diversity case applying California law); *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642, 697 (8th Cir.1982) (diversity case applying Missouri law); *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704, 706 (3d Cir.1981) (diversity case applying Pennsylvania law).

realized the seriousness of her injuries or at the time the immediate, though lesser, effects of the tort were manifest. The plaintiff in *Beech* slipped and fell on the floor of a government building. She immediately experienced considerable pain, and the pain continued for a period of two or three months. X-rays taken after the fall and during the months thereafter revealed no fracture. Approximately eighteen months after the accident, however, the plaintiff's pain recurred at a more intense level. Medical examinations revealed that the plaintiff had sustained an irreparable injury which would render her totally disabled. She filed suit within one year after learning the true nature and extent of her injury, but over two years after she had fallen. In addressing the statute of limitations issue we recognized:

> Where the trauma coincides with a negligent act and *some* damage is discernable at [that] time, the two-year [FTCA] statute of limitations begins to run, even though the ultimate damage is *unknown or unpredictable.*

*Id.* at 874 (emphasis added). Accordingly, we applied the time of event rule and held that the plaintiff's action was time-barred, since she knew she had sustained harm at the time of the fall and had not filed suit within two years as the FTCA required.[8]

■ The rationale supporting the application of the time of event rule is grounded upon the nature and purpose of statutes of limitations. Statutes of limitations are designed primarily to assure fairness to the defendant, *Burnett v. New York Central R.R.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965), while affording the plaintiff a reasonable period of time within which to present his claim. *Kubrick*, 444 U.S. at 117, 100 S.Ct. at 356. Fairness to the defendant requires

the prompt vindication of known rights to ensure that the defendant is not prejudiced as a result of lost evidence, fading memories, and disappearing witnesses. *Burnett*, 380 U.S. at 428, 85 S.Ct. at 1054. The application of statutes of limitations frequently compels courts to determine that the defendant's right to be free of stale claims prevails over the plaintiff's desire to prosecute those claims. *Kubrick*, 444 U.S. at 117, 100 S.Ct. at 356; *Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944).

■ Application of the time of event rule, rather than the discovery rule, reflects the collective legislative and judicial judgment that a plaintiff possessing knowledge of the critical facts of his injury and its cause has the duty to comply with the applicable statute of limitations and make the defendant aware that he will pursue a claim against it. A plaintiff armed with these facts cannot argue persuasively that the time of event rule offends notions of fair play and substantial justice, even though he is unaware of all of the facts related to his injury or its cause. Indeed, in *Urie*, the Supreme Court implied that a plaintiff possessing "notice of the invasion of [his] legal rights" could not avail himself of the discovery rule, since the time of event rule adequately protected the plaintiff's legal interest and rights. 337 U.S. at 170, 69 S.Ct. at 1024.

■ In this case, Albertson argues that his later-developed physical and mental problems, including the blisters first appearing on his hands in the summer of 1969 and later in 1978 or 1979 as well as his liver ailment, behavioral disorder, and other psychological problems, should result in tolling the Jones Act statute of limitations. We

---

**8.** As exemplified by *Beech*, this circuit follows the well-established law that the time of event rule, rather than the discovery rule, applies in cases where the full extent of the plaintiff's injuries are not known at the time of the traumatic event. *See Fletcher v. Union Pac. R.R.*, 621 F.2d 902, 907 (8th Cir.1980) (FELA case), *cert. denied*, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981); *Nivens v. Signal Oil & Gas Co.*, 520 F.2d 1019, 1024 (5th Cir.1975) (diversity case applying Louisiana law), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1509, 47 L.Ed.2d 763 (1976); *Ciccarone v. United States*, 486 F.2d 253, 256 (3d Cir.1973) (FTCA case); *Young v. Clinchfield R.R.*, 288 F.2d 499, 502 (4th Cir.1961); *Brassard v. Boston & Me. R.R.*, 240 F.2d 138, 141 (1st Cir.1957) (FELA case); *Deer v. N.Y. Cent. R.R.*, 202 F.2d 625, 628 (7th Cir.1953) (FELA case).

must disagree. *DuBose, supra,* calls for the application of the discovery rule only when a plaintiff is unaware of and has had no reasonable opportunity to discover the critical facts of his injury and its cause. Albertson possessed the critical facts of his injury and its cause at the time he endured the last exposure to the TCE. At that time he suffered serious damage and noteworthy injury, and he knew the injury was significant.[9] We hold, therefore, that Albertson either possessed or had a reasonable opportunity to discover the critical facts of his injury and its cause at the time of his last exposure to the TCE. His Jones Act cause of action accrued at that time.

This is not a case in which, coinciding with the trauma, an injured seaman experienced and noticed only a minor injury and at a later time discovered an unexpected latent injury that was unknown and unknowable at the time of the traumatic event. *C.f., Marathon Oil Co. v. Lunsford,* 733 F.2d 1139, 1142 (5th Cir.1984). Albertson had knowledge of his injuries at the time he was injured, and he soon knew they were substantial. His lack of knowledge of all the claimed consequences of his injury does not justify a departure from the time of event rule which establishes that the statutory limitations period began to run at the time of the trauma.

## B. THE UNSEAWORTHINESS CLAIM UNDER GENERAL MARITIME LAW

▮ We also hold that the district court correctly concluded that Albertson's cause of action for unseaworthiness was barred by the equitable doctrine of laches. A finding of laches is normally an exercise of discretion in the trial court and bars an action where the plaintiff's inexcusable delay in filing a suit results in prejudice to the defendant. *Gardner v. Panama Railroad,* 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951).

▮ The time period within which an action for unseaworthiness may be commenced is governed by the analogous Jones Act statute of limitations. *Watz v. Zapata Off-Shore Co.,* 431 F.2d 100, 111 (5th Cir. 1970). Once the Jones Act statute of limitations has run, a presumption of laches arises and the burden shifts to the plaintiff to demonstrate that his delay was excusable and that the defendant was not prejudiced thereby. *Id.* With respect to the first showing, Albertson alleges merely that his conduct was excusable because he did not realize the full extent of his injuries. As we have previously set out, Albertson was put on notice that he was harmed to such an extent that he continuously suffered from headaches, nausea, and blackouts and that his poor medical condition required the decertification of his fitness for sea duty status. We find that such notice was sufficient to compel Albertson to initiate his unseaworthiness suit at that time rather than over twelve years later. With respect to the second showing, Albertson failed completely to demonstrate that Stevenson would not be prejudiced by this suit. The uncontested affidavit of Stevenson's vice-president established that Stevenson had a uniform policy of retaining records, logs, and other reports of a particular voyage for a period of only ten years, and that all such records, reports, and logs for the 1968–1969 voyage of the S.S. ST. JOAN had been destroyed approximately three years before Albertson initiated this suit. Albertson's dilatoriness prevented Stevenson from preserving the doc-

---

**9.** The only injury of which Albertson arguably was unaware shortly after he returned from his voyage was the liver ailment he attributes to his exposure to the toxic chemical. However, contrary to his counsel's assertion at oral argument, Albertson's deposition testimony and his later-filed affidavit did not create a genuine issue of a material fact that he actually was suffering from a liver ailment caused by his exposure to the TCE. In his deposition, Albertson testified that no doctor had ever conducted an examina-

tion of his liver, attributed any liver problem to his exposure to TCE, or diagnosed him as suffering from cirrhosis of the liver. His affidavit filed in response to Stevenson's motion for summary judgment is contrary. The nonmoving party cannot defeat a summary judgment motion by attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with his prior deposition testimony. *Kennett-Murray Corp. v. Bone,* 622 F.2d at 894.

uments and thus seriously undermined Stevenson's defense. Accordingly, we hold that the trial court did not abuse its discretion in determining that Albertson's unseaworthiness claim was barred by the doctrine of laches.

Albertson's claims are barred by limitations and laches as the district court held.

AFFIRMED.