W. EUGENE DAVIS, Circuit Judge:
On September 6, 2006, Plaintiff Herbert B. Pretus, Jr. (“Pretus”) sued his employer, Diamond Offshore Drilling Inc., and related entities (collectively, “Diamond”), after being diagnosed in early 2005 with a lung disorder allegedly arising out of his employment on the OCEAN CONFIDENCE and other movable ocean rigs owned by Diamond. Diamond filed a motion for partial summary judgment in which it argued that the suit was time-barred. The district court granted the motion and entered a final judgment dismissing all of Pretus’s claims. Because we find that genuine issues of material fact remain as to when Pretus should have discovered his medical condition so as to trigger the applicable statute of limitations, we reverse and remand.
I. FACTS AND PROCEDURAL BACKGROUND
Pretus began working for a predecessor to Diamond in 1978 as a roustabout. Initially Pretus was part of a crew that worked aboard a submersible drilling rig, but Diamond soon assigned him to the safety department. Thereafter Pretus worked on submersible drilling rigs as a safety representative. From February 4, 1999 through 2000, Pretus was assigned to work on the OCEAN CONFIDENCE, a floating hotel, during the time it was being retrofitted into an offshore drilling rig. While on the OCEAN CONFIDENCE, Pretus assisted in cleaning the rig, which was allegedly wet and moldy.
Pretus served 14 day hitches on the rig, followed by 14 days off duty during which he returned home. During one of his early hitches, Pretus began having respiratory problems. He had “cold-like” symptoms: a cough, fever, aches, congestion, and chest tightness. The symptoms usually improved when Pretus returned home but frequently returned during his next hitch, though Pretus did have some hitches without symptoms.
Other workers on the rig experienced similar ailments, and the symptoms became known as the “Confidence Crud.” Pretus, as safety representative, called doctors engaged by Diamond to seek treatment advice when he or other members of the crew were ill. Diamond had “standing orders” in place on the rig for any employee who had respiratory problems to take medications such as antibiotics and antihistamines, and Diamond provided flu shots and pneumonia shots to any employee who requested them. Pretus took a variety of such medications for his ailments, which usually alleviated his symptoms.
In January 2001, Diamond promoted Pretus to the position of safety supervisor. As a safety supervisor, Pretus worked out of Diamond’s headquarters in Houston but his duties required him to occasionally visit offshore rigs to supervise safety representatives. The parties dispute the frequency and duration of these trips.
While working as a safety supervisor, Pretus continued to periodically suffer from these cold/flu-type symptoms. He was treated by his personal physician, Dr. Michael Ellis, an ear, nose, and throat *480 specialist in Chalmette, Louisiana, on at least one occasion. Dr. Ellis diagnosed Pretus as suffering from bronchitis. Pretus was also treated by Dr. Phillip Weinstein in Houston, Texas. After a few years, Pretus’s symptoms worsened, and in July of 2004 he took a leave of absence due to his severe shortness of breath and coughing. He then went to see a pulmonologist, Dr. Joe Johnson, who treated him for a few months and then referred him to an infectious disease specialist, Dr. Michael Hill. In January of 2005, Dr. Hill advised Pretus that he might have a fungal infection in his lungs.
In March of 2005, Diamond’s insurer sent Pretus to Dr. James Patterson for an independent medical examination. After Dr. Patterson conducted his examination he diagnosed Pretus with hypersensitivity pneumonitis. Dr. Patterson’s independent medical report, submitted by Pretus in opposition to Diamond’s motion for partial summary judgment, described the condition as
an immune/allergic disease of the lung caused by environmental exposure to antigen(s), with Farmer’s Lung being the prototype. Initially, the symptoms resemble a respiratory tract infection, and it is commonly misdiagnosed, as the symptoms are similar with [sic] fever, cough, body aches, headache, chest congestion or tightness. Symptomatic treatment can resolve the symptoms in the early stage of the disease. Mr. Pretus’[s] symptoms followed this pattern. If it is recognized that the symptoms are recurring on exposure, and resolving away from the exposure, the condition can be completely cured by avoiding the exposure altogether.
If the early stage of [hypersensitivity pneumonitis] is not recognized, the condition worsens and progresses with chronic cough, shortness of breath with exercise, and abnormal changes on pulmonary function tests, chest x-ray, and CT scan. Fibrosis of lungs develops, especially in the lower lobes and the condition becomes fixed with irreversible loss of lung function. Mr. Pretus’s course followed this pattern. He has fibrosis of lower lungs on high resolution CT and chest x-ray with similar interstitial changes in lungs.
* * *
The tragedy of this condition is that it is preventable by early recognition and removal from exposure. However, many times it is missed and treated as multiple respiratory infections and the chronic irreversible stage develops. The system that was in place at the job site with “standing orders” to dispense medication on site for respiratory infections probably covered up the diagnosis, delayed recognition, and contributed to the development of the chronic problem of Mr. Pretus.
When Pretus received this diagnosis, he sued Diamond in Texas state court on September 6, 2006 under the Jones Act and general maritime law. Diamond removed the case to federal district court in October 2006. In March 2007 Diamond filed a motion for partial summary judgment in which it argued that Pretus’s Jones Act and general maritime law claims are barred by the three year statute of limitations and that his only remedy lies under state worker’s compensation laws. The district court granted the motion, apparently on the ground that the suit was time-barred, and entered a final judgment dismissing all of Pretus’s claims. From this judgment Pretus appeals.
II. JURISDICTION AND STANDARD OF REVIEW
The district court had diversity jurisdiction under 28 U.S.C. § 1332 and admiralty *481 jurisdiction under 28 U.S.C. § 1338. We have jurisdiction over the district court’s final judgment pursuant to 28 U.S.C. § 1291.
“We review the district court’s grant of summary judgment de novo, applying the same standard as the district court.” Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 524 (5th Cir.2008) (citing Greenwell v. State Farm Mut. Auto. Ins. Co., 486 F.3d 840, 841 (5th Cir.2007)). See Fed.R.CivP. 56.
III. LAW AND ANALYSIS
The dispositive issue on appeal is whether a genuine issue of material fact exists as to when Pretus should have discovered his illness so as to trigger the running of the three year statute of limitations for his Jones Act and general maritime law claims. If they began to run more than three years prior to his filing suit on September 6, 2006, the district court properly dismissed the suit as untimely; if they began to run within that three year period, the suit was timely and should not have been dismissed on that basis.
The statute of limitations for maritime torts is governed by 46 U.S.C. § 30106 (previously 46 U.S.C. app. § 763a): “Except as otherwise provided by law, a civil action for damages for personal injury or death arising out of a maritime tort must be brought within 3 years after the cause of action arose.” The Jones Act, 46 U.S.C. § 30104 (previously 46 U.S.C. app. § 688), adopts the same statute of limitations applicable to suits under the Federal Employees’ Liability Act (“FELA”), 45 U.S.C. § 56, which is three years. Pretus filed his lawsuit on September 6, 2006. Therefore, his suit is only timely if his cause of action accrued on or after September 6, 2003.

Discovery Rule

“A cause of action under the Jones Act and general maritime law accrues when a plaintiff has had a reasonable opportunity to discover the injury, its cause, and the link between the two.” Crisman v. Odeco, Inc., 932 F.2d 413, 415 (5th Cir.1991) (citing Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th Cir.1984)). One of the early cases establishing the framework for this rule is Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), where a worker inhaled silica dust over the course of thirty years of work but became aware of an injury — a related occupational disease, silicosis — only after his symptoms became so severe he became unable to work and was diagnosed with silicosis. Id. at 165-66, 69 S.Ct. 1018. His employer tried to defend under FELA’s three year statute of limitations,[1] but the court rejected the defense, saying that the statute of limitations was not meant to apply to facts that were “unknown and inherently unknowable.” Id. at 169, 69 S.Ct. 1018. This rule, that the statute of limitations is not triggered under certain conditions when the employee does not know of his injury or illness, came to be known as the discovery rule.
This case and others were examined in Albertson, the leading Fifth Circuit case on Jones Act and general maritime law statute of limitations. The plaintiff, Albertson, was forced by his employer to use a dangerous chemical, trichloroethylene (“TCE”), throughout a four-month voyage aboard a freighter which ended in 1969. *482 749 F.2d at 226-27. During the voyage, Albertson began blacking out and experiencing excruciating headaches and nausea. Id. at 227. Upon returning to land, he was hospitalized, and although the doctors apparently failed to advance a definitive diagnosis, they refused to certify him to return to sea. Id. His health continued to decline, and in 1980 he was allegedly informed for the first time of a link between his TCE exposure and his mental and physical problems. Id. at 227-28. He sued his former employer under the Jones Act and general maritime law in 198Í, more than 12 years after the exposure. Id. The district court granted summary judgment in favor of the employer on the ground that the suit was time barred. Id.
On appeal, we discussed the legal principles governing the timeliness of this action:
It is generally accepted that a cause of action for a tort accrues when there has been an invasion of the plaintiffs legally protected interest. See Restatement (Second) of Torts § 899 comments c & e (1977). Ordinarily, this invasion occurs at the time the tortious act is committed. Id.; DuBose v. Kansas City Southern Railway, 729 F.2d 1026, 1028 (5th Cir.), cert. denied, 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 113 (1984). If some injury is discernible when the tortious act occurs, the time of event rule respecting statutes of limitations applies, and the plaintiffs cause of action is deemed to have accrued. If the plaintiff later discovers that his injuries are more serious than originally thought, his cause of action nevertheless accrues on the earlier date, the date he realized that he had sustained harm from the tortious act.
In some cases, however, the injured person may not realize that a tort has been committed upon his person, since he may sustain a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred and after the applicable statute of limitations otherwise would have run. In. such a case, courts have routinely applied the so-called discovery rule to toll the running of the statute of limitations. When the discovery rule applies, the plaintiffs cause of action does not accrue on the date the tortious act occurred, but on the date the plaintiff discovers, or reasonably should have discovered, both the injury and its cause.
749 F.2d at 228-29 (footnote omitted).
The court characterized the latter situation — where the employee does not discover the latent injury until long after the tortious act occurs — as “the pure latent injury case.” Id. at 229. Many occupational diseases are examples of pure latent injuries, the hallmark of which is that “the- plaintiff fails to discover either the injury or its cause until long after the negligent act occurred.” Id. at 230. Under Urie, the discovery rule applies to such claims based on the principle that plaintiffs should not be victimized if they had no knowledge or indication they were injured. Id. at 231.
We contrasted the pure latent injury case with another situation, where the injury is immediately apparent but worsens over time; we labeled this as “the traumatic event/latent manifestation case.” In such cases, “the plaintiff has sustained both immediate and latent injuries caused by a noticeable, traumatic occurrence. At the time of the traumatic event, the plaintiff realizes both that he is injured and what is responsible for causing the injury. The -full extent of the harm, however, has not become manifest.” Id.
In Albertson, we held that the plaintiffs injuries fell under the traumatic event/latent manifestation line of cases because “at *483 the time he endured the last exposure to the TCE ... he suffered serious damage and noteworthy injury, and he knew the injury was significant.” Id. at 233. We further explained:
This is not a case in which, coinciding with the trauma, an injured seaman experienced and noticed only a minor injury and at a later time discovered an unexpected latent injury that was unknown and unknowable at the time of the traumatic event. Cf., Marathon Oil Co. v. Lunsford, 733 F.2d 1139, 1142 (5th Cir.1984). Albertson had knowledge of his injuries at the time he was injured, and he soon knew they were substantial. His lack of knowledge of all the claimed consequences of his injury does not justify a departure from the time of event rule which establishes that the statutory limitations period began to run at the time of the trauma.

Id.

Later cases have continued to draw the distinction between pure latent injury cases and traumatic event/latent manifestation cases, but the analysis often depends on the facts. In Clay v. Union Carbide Corp., 828 F.2d 1103 (5th Cir.1987), for example, the plaintiff, Clay, was exposed to toxic chemicals and thereafter suffered significant symptoms including “laryngitis, difficulty breathing, nausea, burning eyes, headaches, bronchitis, memory loss, mental confusion, dizziness, prostate gland trouble, erratic heartbeats, sinus congestion, and a productive cough.” Id. at 1105. These ailments only occurred when he worked around the chemicals, not while he was away on other jobs or at home. Id.
Approximately eight years after changing jobs to get away from the chemicals, Clay was diagnosed with “chronic respiratory complaints,” and he sued his employer under the Jones Act and general maritime law. The district court granted summary judgment in favor of the employer on the basis of untimeliness.
On appeal, Clay argued that his various ailments only constituted “minor physical ailments, ... [as] distinguished] from Albertson’s severe headaches and blackout spells.” Id. at 1106. Specifically,
Clay argu[ed] strongly that when a worker suffers minor physical annoyances, such as headaches, transient dizziness, or congestion that he causally connects to his work environment, such knowledge should not be considered an invasion of a legal interest sufficient to start the statute of limitations running against him thereby precluding suit when he is later found to be suffering from a serious occupational illness.
Id. at 1106-07. We specifically noted that “Clay’s argument has merit and is not foreclosed by Albertson” based on the above quoted passage. Id. at 1107. However, Clay’s injuries were “virtually identical” to his eventual diagnosis of “chronic respiratory complaints”; therefore “Clay possessed or had reasonable opportunity to discover the critical facts of the injury he claims to have suffered.” Id. (emphasis added).
Likewise, in Crisman, the plaintiff, Crisman, sued his employer after sustaining “a hearing loss, a chemical toxicity disorder, and respiratory injuries” after exposure to petroleum-based chemicals at work. 932 F.2d at 414. However, Crisman admitted in deposition testimony that he knew at the time of exposure to the chemicals— more than a decade prior to filing suit— that his exposure had caused those conditions, and he complained to his employer and co-workers at the time. Id. at 416. The record was replete with other evidence and testimony that Crisman had known of those conditions and their cause *484 well over three years before filing suit. Id. at 414-17.
Crisman argued that the issue of timeliness was one for the factfinder and should not have been decided on summary judgment, but the argument was foreclosed because the material facts were not in dispute. “While evaluating when a plaintiff reasonably was put on notice ordinarily is a factual determination, in this case there was such an overwhelming array of evidence indicating that the case was time-barred that summary judgment was appropriate.” Id. at 417 n. 4. Consequently, under the three year statute of limitations, we held that the suit was time-barred. Id. at 418.
Finally, in Taurel v. Central Gulf Lines, Inc., 947 F.2d 769 (5th Cir.1991), the plaintiff, Taurel, had worked as a merchant seaman since 1958. Id. at 770. He had “complained of pulmonary and respiratory difficulties” throughout his career and had visited a hospital in 1963 and 1965 complaining of difficulty in breathing. Id. From 1975 to 1981, chest X-rays taken during routine physicals were declared normal, and in 1984 he was treated for bronchitis but was not diagnosed with anything more serious. Id. In 1987 Taurel was diagnosed with asbestosis as a result of a routine screening test conducted in 1986 or 1987. Id. at 771.
Taurel sued his employer in 1988 under the Jones Act and general maritime law, but the district court granted summary judgment in favor of the employer based on untimeliness. Id. It found that Tau-rel’s cause of action had accrued in 1980 based on Taurel’s deposition testimony that fellow seamen and a doctor had informed him no later than 1980 that his problems might be related to asbestos. Id. at 771-72.
On appeal, we addressed the “critical question” of when Taurel’s cause of action accrued, finding that it did not accrue until a physician actually diagnosed Taurel with asbestosis in 1987; thus, his 1988 suit was timely. Id. at 771. We found particular significance in the fact that Taurel had been to various doctors who did not make findings consistent with asbestosis and failed to diagnose asbestosis. Id. at 772. We concluded that a genuine issue of material fact remained as to when Taurel “discovered, or should have discovered, that he had asbestosis,” and that the district court erred in concluding that the suit was time-barred under the three-year statute of limitations. Id.

Analysis

The above cases focus on several considerations: first and foremost, the severity of the traumatic event and initial symptoms; second, the plaintiffs correlation of his ultimate injury with the traumatic event; and third, the plaintiffs reasonable reliance on the opinions of medical experts.
The first consideration, the severity of the traumatic event and initial symptoms, is illustrated by Albertson, where exposure to a dangerous chemical caused excruciating headaches, blackouts, and nausea; and Clay, where exposure to toxic chemicals caused both moderate and severe symptoms, including memory loss, prostate gland trouble, and erratic heartbeats. Where the event is not particularly traumatic and the initial symptoms are not severe, such that the plaintiff did not discover and should not have discovered the latent injury until later, the discovery rule may apply, as illustrated by Taurel. Indeed, even Clay acknowledged that “routine physical annoyances” that are “causally connected] to [an employee’s] work environment” do not necessarily trigger the running of the statute of limitations. 828 F.2d at 1106-07.
*485 It is undisputed that Pretus had medical problems that related to his work on the OCEAN CONFIDENCE and, perhaps, other vessels. Unlike in Albertson and Clay, viewing the facts in the light most favorable to the nonmovant, Pretus, there was no discrete traumatic event like a chemical exposure, and the contemporaneous symptoms were not severe. Pretus submitted an affidavit in opposition to Diamond’s motion for partial summary judgment in which he referred to having “cold-type symptoms including a sore throat, fever, sinus pressure, coughing, and nose congestion” during his time aboard the OCEAN CONFIDENCE in 1999 and 2000.
Pretus’s characterization of the symptoms as “cold-type” is supported by two “Injury or Illness Reports” filled out by him in 2000 and submitted by Diamond in support of its motion. In a March 1, 2000 report, Pretus complained of a head cold, running a low-grade fever, a headache, and body aches. In a May 25, 2000 report, he complained only of a low-grade fever, body aches, and a cough. Neither report states a cause for those symptoms.
Until 2004, the only diagnoses his physicians gave him were common illnesses such as colds, sinus infections, and bronchitis. His symptoms improved with antihistamines and antibiotics, which could have led him to believe that the physicians had correctly diagnosed his malady. Nothing about those symptoms necessarily suggests a serious illness like the cases discussed above. A factfinder could classify them as “routine physical annoyances” under Clay, 828 F.2d at 1106-07.
Under the second, related consideration, the plaintiffs correlation of his ultimate injury with the traumatic event, it is significant that Pretus is not suing based on those initial symptoms. This case therefore differs from Clay, where the plaintiffs eventual diagnosis of “chronic respiratory complaints” simply encompassed his initial symptoms that were manifested more than three years prior to suit; and Crisman, where the plaintiff’s suit was based on hearing loss and other conditions that he knew about for more than three years prior to filing suit. Thus, a factfinder could conclude that it does not matter that Pretus could correlate a cold, sinus infection, or bronchitis to his workplace. Those are short-term afflictions that disappear with treatment, and according to his summary judgment evidence that is essentially how his symptoms behaved until 2004. In short, under the first two considerations, there is a genuine issue of material fact as to the existence of a traumatic event and the severity of Pretus’s symptoms prior to 2004.
The third consideration, the plaintiffs reasonable reliance on the opinions of medical experts, is best illustrated by Tau-rel. There, we held that a plaintiffs cause of action did not accrue until he was actually diagnosed with asbestosis, when earlier medical screenings and treatment for bronchitis and other pulmonary ailments had failed to uncover the condition. Even though doctors and coworkers previously suggested to the plaintiff that his problems might be related to asbestos, only the eventual diagnosis provided notice that his condition was something more serious than a routine ailment.
This case is analogous to Taurel, in that both involved pulmonary conditions caused by long-term exposure to an airborne irritant or agent, and in both cases medical experts’ initial diagnoses failed to identify a serious condition. Pretus diligently sought help for his medical problems, both while he was suffering from minor symptoms in 1999 and 2000, and a few years later when he developed a more serious pulmonary disability. He was initially diagnosed with nothing more serious than *486 bronchitis because the symptoms at the time did not indicate to Pretus’s physicians that he had a serious disease. In 2004, when treatment for colds, sinus infections, and bronchitis failed to alleviate his increasingly severe and debilitating symptoms, Pretus took a leave of absence to seek further treatment.
Only in 2004 and 2005 did doctors finally determine that Pretus had a serious illness, one that was entirely different from bronchitis. After extensive testing, including high resolution CT scans, were his physicians first able to diagnose his condition as “chronic interstitial lung inflammation,” permanent “fibrosis (scarring) of his lung tissue,” and hypersensitivity pneumonitis. The independent medical report of Dr. Patterson, which was submitted by Pretus in opposition to Diamond’s motion, fully supports Pretus’s version. Dr. Patterson’s report explains that the condition is difficult to diagnose and is often misdiagnosed in the early stages.[2] Pretus obtained these diagnoses less than three years before he filed suit. If the factfinder concludes that Pretus could not have reasonably discovered that he had a serious illness before 2004, the 2006 suit is timely under the Jones Act and general maritime law statute of limitations.
Based on Pretus’s affidavit, the reports he filled out in 2000, his diagnoses from various physicians, and Dr. Patterson’s report, a reasonable person could conclude: (1) his early symptoms suggested nothing more serious than the common cold, sinus infections, bronchitis and the like; (2) these ailments are the type of “minor physical annoyances” mentioned in Clay that do not trigger the running of a limitations period even if Pretus “causally eonnect[ed] [the ailments] to his work environment,” 828 F.2d at 1106; and (3) Pretus’s cause of action therefore did not accrue until after September 6, 2003.
We therefore conclude that a jury question is presented as to when Pretus reasonably should have discovered that he was suffering from a serious medical condition, and the district court erred in granting summary judgment in favor of Diamond.
IV. CONCLUSION
For the above reasons, the district court’s judgment dismissing Pretus’s suit is reversed, and the case is remanded for further proceedings consistent with this opinion.
REVERSED and REMANDED.

. FELA and the Jones Act have a strong connection. See Johnson v. Cenac Towing, Inc., 544 F.3d 296, 301 n. 2 (5th Cir.2008) (“The Jones Act, 46 U.S.C. § 30104, makes the provisions of the Federal Employers’ Liability Act ... applicable to seamen. Jones Act cases, therefore, follow cases under FELA.’’).

. The report also suggests that Diamond’s own "standing orders” to treat the respiratory ailments probably contributed to the failure to discover and prevent the development of Pretus’s hypersensitivity pneumonitis.