William CRISMAN

v.

ODECO, INC.

Civ. A. No. 88–3974.

United States District Court, E.D. Louisiana.

April 27, 1990.

Bob F. Wright, Richard C. Broussard and
Domengeaux & Wright, Lafayette, La., for
William Crisman.

Joe A. Sigman, M.D., J.D., New Orleans,
La., pro se.

Maurice C. Hebert, Jr. and Alan G.
Brackett, New Orleans, La., for ODECO,
Inc.

ROBERT F. COLLINS, District Judge.

Defendant, ODECO, Inc., moves the
Court for summary judgment in its favor,
dismissing the claims of plaintiffs, William
and Patricia Crisman, on the basis that
their claims have prescribed. For the rea-
sons given below, the Court GRANTS the
motion.

## I. INTRODUCTION

This matter involves personal injuries al-
legedly sustained by Crisman during the
course of his 19 years of employment with
ODECO, Inc. Crisman alleges that he has
sustained: (1) a hearing loss; (2) a chemical
toxicity disorder; (3) a respiratory and up-
per respiratory injury; and (4) fear of can-
cer due to exposure to toxic substances.
Plaintiff, Patricia Crisman, has asserted a
claim for loss of consortium.

Defendant contends that because plain-
tiffs knew or should have known that the
alleged symptomatology was causally relat-
ed to plaintiff's employment with ODECO
several years prior to his filing suit, plain-
tiffs' claims have prescribed and, therefore,
should be dismissed.

## II. FACTS

Plaintiffs' claim involves detailed, yet un-
disputed facts. Crisman has been em-
ployed by ODECO since 1970 as a mechan-
ic. Crisman primarily worked as a mechan-
ic aboard drilling rigs in the Gulf of Mexi-
co. The first rig Crisman worked aboard
for ODECO was the D/B RIMTIDE in
1970. While working aboard the D/B RIM-
TIDE, Crisman alleges that he was ex-
posed to Glidden Du Pont paint (Crisman
Deposition, p. 38) (hereinafter "Deposi-
tion"), which caused him severe headaches,
burning in his lungs, eyes, sinuses, throat
and nose, and caused pressure behind his
eyes (Deposition, pp. 39–41). Crisman stat-
ed that he recovered from this incident
within three to four days and did not report
the incident to anyone with ODECO. Id.
Crisman specifically testified: "I thought it
was the paint after that, because every-
body else was having a problem with that
stuff." (Deposition, p. 41) Crisman stated
that he was not exposed to any other toxins
aboard the D/B RIMTIDE (Deposition, pp.
42, 60).

In 1970 or 1971, Crisman was transfered
to the D/B ELDORADO. Aboard the D/B
ELDORADO, he stated that he did not
have a problem with paint fumes but, rath-
er, was required to work in stability tanks
aboard the rig where welding was in

progress. Crisman stated that whenever he worked in the stability tanks, welding smoke in the tanks caused headaches and burning in his chest and sinuses and caused a metallic taste in his mouth. These problems only occurred while he was working in the stability tanks (Deposition, pp. 43–44, 60–61). Crisman stated that the condition with his headaches and burning in his chest and sinuses would resolve when he returned home from a seven-day hitch offshore. Crisman stated that there was only one occasion he could recall when his condition did not resolve during his week off from work, and this was an occasion when he had worked in 110–degree heat in an engine room on the rig (Deposition, p. 45).

Crisman worked aboard the D/B ELDORADO from 1970 until 1976 and never reported any of these incidents to ODECO. Crisman further stated that he never sought or obtained treatment for these problems. Crisman stated that he did not consult with a physician because the condition always resolved when he arrived home for his week off from work and usually cleared up within one day of returning home (Deposition, pp. 46–48).

In 1975 or 1976, Crisman was transferred to the D/B OCEAN LEADER where he worked as a rig mechanic until 1986 (Deposition, p. 51). Aboard the D/B OCEAN LEADER, Crisman was again allegedly exposed to Glidden Du Pont paint, and in 1978 or 1979, he began to notice the development of headaches from these paint fumes (Deposition, pp. 52–53). Crisman stated that he tried to avoid these fumes while at work, but he nevertheless experienced headaches due to paint fumes on virtually every hitch he worked during his tenure aboard the D/B OCEAN LEADER (Deposition, pp. 54, 56). Crisman did not seek treatment from any physician for this condition, because the condition always cleared up when he went home from work and when he was away from the paint fumes (Deposition, p. 55).

Also, Crisman was exposed to welding fumes in the machinery room aboard the D/B OCEAN LEADER and was exposed to oil-based muds and completion fluids which caused him headaches and caused him to generally "feel bad" (Deposition, pp. 57–58).

Crisman was also allegedly exposed to mineral spirits, paint thinners, and various solvents aboard the rigs, which caused him similar medical problems. Crisman stated that he experienced these problems only when working aboard ODECO rigs (Deposition, p. 59). Crisman noted that in 1984 or 1985, he also began to experience insomnia while aboard the D/B OCEAN LEADER (Deposition, p. 61).

In 1986, Crisman was transferred from ODECO to work for a related company as a mechanic aboard a platform located on the Outer Continental Shelf. While working aboard a platform, Crisman was exposed to International Paint when he was required to paint a compressor in the engine room aboard that platform. Crisman stated that he had a "bad reaction" to this paint consisting of irritation in his chest and bronchial tubes. Crisman stated that this condition cleared up in approximately one week (Deposition, pp. 62–66). Crisman further noted that while working aboard platforms, he was exposed to paraffin remover, which caused severe headaches (Deposition, p. 66), as well as being exposed to triethylene glycol, which also caused headaches (Deposition, p. 67). Like his work aboard rigs with ODECO, Crisman stated that on his off time from work, he did not experience any problems as he experienced while at work (Deposition, p. 70.).

Following the summer of 1986, Crisman returned to work with ODECO aboard the D/B OCEAN LEADER. Crisman stated that when he returned to work with ODECO, paint fumes continued to cause problems for him (Deposition, p. 71). Crisman was then transferred to the D/B OCEAN RULER, where he was also exposed to paint thinner and paint fumes. These paint fumes likewise caused headaches and dizziness (Deposition, p. 72). Crisman worked one hitch in the generator room aboard the D/B OCEAN RULER where exhaust fumes caused him nasal irritation and bleeding (Deposition, p. 73). Crisman stated that these exposures to various sub-

stances resulted in his suffering from dizzy spells, memory problems, general fatigue and headaches (Deposition, pp. 73–74, 80, 111). All of these conditions were evident to Crisman by 1984, but he never told any physician prior to 1986 of the problems he experienced aboard rigs or platforms (Deposition, pp. 94, 111). Crisman admitted that this alleged illness was caused aboard rigs and that its origins were in his exposure to paint fumes (Deposition, pp. 118, 121–122, 155–157).

Further, Crisman acknowledges that by at least 1978–1979, he complained to his supervisors and co-workers at ODECO that he suffered headaches due to his exposure to paint fumes. These complaints were made on numerous occasions (Deposition, pp. 110–111, 139–140).

That Crisman was aware he was suffering from some medical problems is well documented. The records of New York Life Insurance Company, ODECO's health insurance provider during 1983, show Crisman's knowledge of his alleged condition. Health insurance forms dated from August through December of 1983 contain a diagnosis of "allergic rhinitis" and indicate that the date symptoms appeared was "1963, worse in recent times". (New York Life Insurance Company claims forms dated August 11, 1983, October 18, 1983, October 23, 1983, October 31, 1983, November 11, 1983, November 17, 1983, November 26, 1983, December 1, 1983, December 13, 1983 and December 28, 1983, identified as Exhibit B, *in globo*) Each of these claims forms is signed by Crisman. Crisman does not dispute the 1983 diagnosis, but he denies having assigned 1963 as the onset of his illness.

Records of Provident Life and Accident Insurance Company ("Provident"), ODECO's health insurance carrier from 1984 through 1987, likewise illustrate Crisman's knowledge of his symptoms. Seventeen claims forms between the years 1984 and 1987, all of which are signed by Crisman, state that his condition began in 1963 and had become worse recently. (Health claim forms dated January 25, 1984, February 3, 1984, February 9, 1984, March 2, 1984 (two

forms), March 19, 1984, March 21, 1984, April 4, 1984, May 15, 1984, June 22, 1984, September 6, 1984, September 20, 1984, January 31, 1986, August 7, 1986, January 12, 1987, February 3, 1987 and June 22, 1987, identified as Exhibit D, *in globo*). Crisman again denies fixing 1963 as the beginning of his illness, but he does not deny that the forms indicate that his condition was getting worse.

In 1987, Pan–American Life Insurance Company became ODECO's health insurance carrier. On a claim form dated September 26, 1987 and signed by Crisman, crisman stated that the illness resulted from his occupation and, in addition, specifically noted that the duration of his illness was over 20 years. (Health claim form dated September 26, 1987, identified as Exhibit E). In addition, three Provident claims forms indicate 1983 as the commencement of Crisman's illness, and one form identifies 1984 as the commencement of Crisman's illness. (Health claim forms dated February 1, 1986, March 17, 1987, April 27, 1987 and May 10, 1987, identified as Exhibit D, *in globo*).

Additionally, Dr. G.D. Sagrera testified that he treated Crisman between 1966 and 1979 for a variety of "allergic reactions" and upper respiratory infections. Dr. Sagrera testified that the allergies for which he treated Crisman were "contact type" conditions. Dr. Sagrera testified: "I think that was some contact type of allergy, something either that he took in internally or that he touched." (Exhibit G, p. 4.)

Dr. Sagrera testified that he would have discussed with Crisman the fact that his continuing allergic-type reaction problems were environmental in nature, resulting from Crisman's exposure to reaction-causing substances (Exhibit G, p. 23). The latest time that Dr. Sagrera could have possibly discussed this situation with Crisman was in 1979, when he last treated Crisman. Accordingly, Crisman was advised, as early as 1979, by a physician that his periodic allergic-type reactions were caused by substances with which he came into contact.

With regard to Crisman's alleged hearing loss, he acknowledged that he realized he

sustained a hearing loss no later than 1973 (Deposition, pp. 122–123). Further, he complained to his supervisor about noise conditions during the course of his employment (Deposition, pp. 137–138). The medical records of Dr. Sagura show that Crisman's hearing loss was known and stable in 1979 (Exhibit E to Defendant's Motion for Summary Judgment).

Additionally, Dr. Sagrera testified concerning Crisman's auditory examination and his discussions with Crisman concerning the cause of his hearing loss. Dr. Sagrera testified that he told Crisman in 1976 that his hearing loss was caused by heavy machinery noise (Exhibit G, pp. 19–20).

Dr. Clyde E. Landrum's deposition was also taken concerning his treatment of Crisman. Dr. Landrum performed an auditory evaluation of Crisman in 1978. Dr. Landrum testified that he discussed work place noise exposure and its effect on Crisman's hearing (Exhibit H, p. 13).

As this medical testimony reveals, Crisman was told by two physicians that his hearing loss, evident to Crisman by his own testimony no later than 1973 and documented by physicians in 1976 and 1978, was related to noise exposure in Crisman's work place. Crisman, therefore, had *actual knowledge* that work place noise exposure caused his hearing loss.

## III.  LAW

█ The Court must resolve a common issue in a novel fact situation. It is elementary that the Jones Act prescriptive period is three years from the date a cause of action accrues. 46 U.S.C.App. § 688; *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223 (5th Cir.1984). There are, however, two lines of Fifth Circuit precedents which are possibly applicable to the instant facts. The first line of cases involves a traumatic event and a latent manifestation of injury. The other line involves a pure latent injury which would require application of the discovery rule. On these facts, there was not a traumatic event, but there was not a purely latent manifestation. As the Court charts a course through the murky waters of the Jones Act prescriptive period, it must determine whether Crisman had adequate storm warnings to steer him to the courthouse to file his claim. *See, e.g., Jensen v. Snellings*, 841 F.2d 600 (5th Cir.1988) (securities investors not allowed to ignore "storm warnings" of false statements and possible claim). The issue, therefore, is whether the Court should apply the discovery rule to facts which indicate that the plaintiff had knowledge of his illness without having been subjected to a traumatic event. The Court will now examine the two lines of Fifth Circuit cases dealing with this situation.

### A.  *Traumatic Event/Latent Manifestation*

*Albertson v. T.J. Stevenson & Co., supra,* provides a starting point for analysis of the traumatic event/latent manifestation line of cases. In *Albertson,* plaintiff worked as an electrician aboard an ocean-going vessel for an 18–month period ending in February of 1969. Plaintiff was allegedly injured when he used a toxic chemical, used to clean electrical equipment, undiluted and without the use of a respirator. As a result of this exposure, plaintiff experienced severe headaches on five or six occasions.

After leaving the service of the vessel, he sought medical treatment and was treated from 1969 through 1979. Throughout the course of his treatment, plaintiff's symptoms became worse, and a number of additional medical problems were diagnosed. Plaintiff claimed that he was first advised of the connection between his exposure in 1969 and his illness in 1980. Plaintiff filed suit in 1981, 12 years following his claimed injurious exposure.

Defendant moved for summary judgment on the basis of prescription, which was granted by the trial court. On appeal, the Fifth Circuit held that the Time of Event Rule applied and that Albertson's cause of action accrued in 1969. Therefore, the prescriptive period began to run at the time of exposure, and Albertson's claims prescribed in 1972, nine years before he filed suit.

The Fifth Circuit described Albertson's claim as a "traumatic event/latent manifestation" case, because as a result of his exposure, Albertson had both an immediate reaction to his alleged exposure, as well as having sustained latent injuries that did not manifest themselves until much later. However, the Court held that simply because the full extent of his injuries did not manifest themselves at the time of exposure, Albertson had sufficient knowledge that he had been injured and reasonable opportunity to investigate and discover the "critical facts" of his injury, such that he *should have known* of the relationship of his injury to his exposure. As the *Albertson* court explained:

> It is generally accepted that a cause of action for a tort accrues when there has been an invasion of the plaintiff's legally protected interest. Ordinarily, this invasion occurs at the time that the tortious act is committed. If some injury is discernible when the tortious act occurs, the time of event rule respecting statutes of limitations applies, and the plaintiff's cause of action is deemed to have accrued. If the plaintiff later discovers that his injuries are more serious than originally thought, his cause of action nevertheless accrues on the earlier date, the date he realized that he had sustained harm from the tortious act.

*Id.* at 228–229 (citations omitted).

The Court specifically distinguished Albertson's case from a "pure latent injury" situation, where a plaintiff is injured but has no knowledge of either an injury or its relationship to his exposure. For example, where a worker sustains silicosis from occupational exposure, but has no manifestation of injury, the Time of Event Rule is inappropriate and the "Discovery Rule" is applied. The Court explained that in a pure latent injury situation, plaintiff's cause of action accrues when he discovers, or should have discovered, both the injury and its cause. *Id.* at 229–231.

To the contrary, in *Albertson*, plaintiff knew of his injury because there was the immediate manifestation of headaches. Further, Albertson had informed his supe-

riors aboard the vessel that he would not utilize the substance to which he was exposed for the duration of the vessel's voyage. The Court held that these facts showed sufficient knowledge of an injury to Albertson and, therefore, his cause of action accrued at that time. *Id.* at 231. The Court stated: "A plaintiff on these facts cannot argue persuasively that the time of event rule offends notions of fair play and substantial justice, even though he is unaware of all of the facts related to his injury or its cause." *Id.* at 232.

The Fifth Circuit also examined when a toxic exposure cause of action accrued in *Hagerty v. L & L Marine Services, Inc.*, 788 F.2d 315, *modified*, 797 F.2d 256 (5th Cir.1986) and *Clay v. Union Carbide Corp.*, 828 F.2d 1103 (5th Cir.1987). In *Hagerty*, plaintiff was drenched with dripolene, a chemical containing benzene, toluene, and xyolene. After his drenching, he suffered a brief period of dizziness, followed by leg cramps. The following day, he felt a stinging in his extremities. Following *Albertson*, the Court held that Hagerty's cause of action would accrue if his injury was discernible on the occasion when he was drenched with the toxic chemical. Applying the *Albertson* rule, the Court held that dizziness, leg cramps, and a persistent stinging sensation in the feet and fingers suggested sufficient notice of harm or injury so as to fall within the rubric of a traumatic event/latent manifestation case.

In *Clay*, plaintiff was a Jones Act seaman working aboard river pushboats, which pushed river barges containing toxic chemicals, from 1969 until 1976. Plaintiff was allegedly exposed to vapors and fumes from the chemicals carried aboard these various barges. During the time of his employment, Clay suffered from a number of ailments, including laryngitis, difficulty breathing, nausea, burning eyes, headaches, bronchitis, memory loss, mental confusion, dizziness, prostate gland trouble, erratic heartbeat, sinus congestion, and a productive cough. His symptoms, however, improved when he was not working. He testified in his deposition that he did not experience any health problems when he was at home. Further, while he was work-

ing, he complained to his captain that the fumes from the chemicals made him feel ill.

In 1985, Clay consulted a physician who attributed his ailments to "prolonged exposure to irritant vapor and fumes." Suit was not filed until September 6, 1985 alleging claims under the Jones Act and general maritime law.

The Fifth Circuit held that Clay's case was of the type described in *Albertson, supra,* as traumatic event/latent manifestation, and, therefore, the Time of Event Rule for prescription applied. Plaintiff argued that the Time of Event Rule should not apply because the ailments he suffered at the time of his exposures produced only "minor physical ailments." The Court rejected plaintiff's argument, however, because Clay had knowledge of an injury and its cause while he was working for his employer. Therefore, as the Fifth Circuit held, the plaintiff:

"... possessed or had reasonable opportunity to discover the critical facts of the injury he claims to have suffered. Clay's deposition also reveals that he knew or had reasonable opportunity to discover the cause of his injury. For example: Clay knew his symptoms were worse when he was around the chemicals ..."

828 F.2d at 1107. The Court finds that the traumatic event/latent manifestation line of cases is distinguishable from the instant facts because Crisman did not suffer a truly traumatic injury.

### B. *Pure Latent Injury*

As noted above, *Albertson* defined a pure latent injury case as one in which "the plaintiff fails to discover either the injury or its cause until long after the negligent act has occurred."

The discovery rule has been analyzed by the Fifth Circuit and other federal circuits in cases involving exposure to toxic substances. In *W.T. Smith v. States Marine Intern., Inc.,* 864 F.2d 410 (5th Cir.1989), the Fifth Circuit analyzed the causal prong of the discovery rule. In *Smith,* a marine engineer who worked aboard merchant vessels intermittently from 1942 until 1966, and then continuously from 1966 until his

retirement in 1982, brought suit in 1987, almost five years after his last engineering job, for damage to his hearing under both the Jones Act and general maritime law. The district court granted the shipping company's motion for summary judgment on the ground that Smith's causes of action were time barred.

The Fifth Circuit reversed and remanded the case, noting that neither the historical facts of *Smith* nor the applicable legal standards as enunciated in *Clay v. Union Carbide Corp., supra,* and *Albertson v. T.J. Stevenson, supra,* were in dispute. The Fifth Circuit summarized the issue as follows:

"Whether Smith possessed or had a reasonable opportunity to discover the critical facts of his injury *and* its *cause* at least three years before he filed suit."

The Court added:

"Summary Judgment could not properly be rendered, therefore, unless Smith *should* have appreciated that his hearing loss was attributable to long-term exposure to loud noises."

864 F.2d at 412.

The Court found there was no evidence in the record from which to deduce the factual predicate that Smith could have known or actually did know of the general correlation between his exposure to noise and the hearing loss he suffered.

The Sixth Circuit analyzed the time of event/discovery rule dilemma in *Hicks v. Hines, Inc.,* 826 F.2d 1543 (6th Cir.1987). In *Hicks,* plaintiff was a Jones Act seaman who worked for various barge companies from 1954 through 1967. He alleged that in the course of his work, he was exposed to various chemicals such as chlorine, caustic soda and benzene. As early as 1973, one of Hicks' treating physicians asked if he worked in a chemical plant and mentioned that Hicks had chemical spots in his eye and could expect degeneration in that eye. In 1983, he was diagnosed as suffering from bladder cancer. Hicks filed suit in 1984 under the Jones Act against various barge companies and a chemical manufacturer alleging that exposure to the chemicals caused his bladder cancer. Rea-

soning that Hicks knew of his eye condition as early as 1973 and that this knowledge demonstrated that he had had an obvious injury and knew its cause, the district court dismissed the case as time barred. The district court further held that suit based on the bladder cancer was barred because it was a result of the same alleged tortious exposure to harmful chemicals.

After analyzing the *Albertson v. T.J. Stevenson Co., Inc.,* 749 F.2d 223 (5th Cir. 1984) line of cases and the *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) line of cases, the Sixth Circuit held that the facts in *Hicks* pointed to application of the discovery rule. The Court added:

> "We recognize the difficulty which arises when a plaintiff who has suffered a legally cognizable but relatively small injury is required to sue for both existing and potential damages. This difficulty may be particularly formidable when there is only a possibility of any particular future illness, as can often occur when the potential illness is cancer (citations omitted). A plaintiff's interest in filing his suit within the relevant statute of limitations conflicts with his inability to display symptoms of a particular future illness. The defendant's interest and repose also conflicts with his exposure to claims for potential damages which may never come to pass."

826 F.2d at 1545.

The Sixth Circuit found that the district court's conclusion that Hicks was aware that he had chemical spots on his eyeballs as early as 1973 was correct. However, it was not clear to the court that the eye doctor related Hicks' chemical exposure to the spots or that Hicks' awareness of his injury provided notice that would trigger the running of the statute of limitations.

Nevertheless, the Court affirmed the district court and held that plaintiff's blindness and his doctor's warnings gave him sufficient notice of his potential claim more than three years before the claim was filed. The Court finds that the discovery rule is not applicable here because Crisman was not totally unaware of his alleged injuries.

## C. *Continuing Tort*

■ In the alternative, plaintiff suggests that the facts and circumstances of his case point to the applicability of the "Continuing Tort Doctrine." In *Nasser v. Hudson Waterways Corp.,* 563 F.Supp. 88 (W.D.Wash. 1983), the Court held that the Doctrine of Continuing Tort was applicable in Jones Act cases. In *Nasser,* the seaman alleged that he received negligent medical care. He did not file suit until three years and twenty-six days after his initial injury. The Court held that the Jones Act's statute of limitations may be tolled until the tortious conduct ceases, on the theory that one should not be allowed to acquire a right to continue tortious conduct. The Court added:

> "Where injury results from a negligent act, and the injury continues by reason of continued negligence, a recovery may be had for damages caused by the continuing negligence, although the cause of action for the original injury is time-barred."

563 F.Supp. at 90. *Nasser* is most appropriately characterized as a maintenance and cure case. In sum, *Nasser* held that the statute of limitations begins to run each day that a vessel owner breaches his duty to provide maintenance and cure. Crisman has not alleged a failure to provide maintenance and cure in this case. The Court therefore finds *Nasser* and the Continuing Tort Doctrine inapplicable to this chemical exposure case. The Continuing Tort Doctrine was recently applied in *Meadows v. Union Carbide Corp.,* 710 F.Supp. 1163 (N.D.Ill.1989). In *Meadows,* plaintiff worked as a reactor operator for a chemical company. Shortly after he began working at the chemical plant, he developed a rash. Later, he began suffering from nervousness, breathing difficulties and heart palpitations. By August of the same year, he was told by a doctor that his condition was caused by chemical toxicity.

Meadows then requested a transfer from the reactor room because he believed chemicals were causing his medical problems. The request was denied. He stayed on the job and his problems continued. A few years later in 1983, he again requested

transfer from the reactor room and was again denied. Suit was finally filed on August 14, 1986. The Court, applying Illinois law, held that the defendant chemical company's failure to provide a safe product and its failure to adequately warn the plaintiff of the dangers of using the product, constituted a continuing tort. Thus, plaintiff's cause of action accrued on the date when he last faced chemical exposure. *Meadows* added that although the plaintiff was well aware of the cause of his injury and could foresee the possible severity of his injury, his claim was not time barred as a matter of law. The Court put forth the following rule of law:

> "... we conclude that the limitations period does not begin to run when the plaintiff acquires knowledge that his deteriorating physical condition was or may have been caused by his use of potentially hazardous chemicals. We look instead to the date of the last exposure. To hold otherwise would allow a party to acquire a right to continue engaging in tortious conduct."

710 F.Supp. at 1166. Although *Meadows* was a chemical exposure case, it is likewise distinguishable. The *Meadows* court applied Illinois products liability law to find that the defendant's conduct constituted a continuing tort. Further, the *Meadows* plaintiff was twice denied the opportunity to transfer from the injury-causing location. Here, the Court is applying federal law provided by the Jones Act, 46 U.S.C. App. § 688. Likewise, the record does not indicate that Crisman requested a transfer. Even if the Court was convinced that the Continuing Tort Doctrine was applicable here, it is constrained by contrary Fifth Circuit precedent. *See Emmons v. Southern Pacific Transportation Co.*, 701 F.2d 1112 (5th Cir.1983) (Under FELA, there can be no continuing tort without the employer's knowledge of the injury-causing activity.).

## IV. ANALYSIS OF THE INSTANT FACTS

### D. *Perceptible Injury/Appreciable Manifestation*

■ As it clearly appears that Crisman had sufficient notice of his impending problems, the Court finds that this situation is best described as a perceptible injury with appreciable manifestations. Crisman acknowledges that he had problems only aboard the rigs and that these problems occurred when he was exposed to paint fumes. Since the Jones Act incorporates by reference the Federal Employers' Liability Act's (FELA) limitations period, 45 U.S.C. § 56, the Court looks to FELA cases for guidance on this novel issue. Under FELA, a cause of action does not accrue until the claimant becomes aware that he has been injured and that injury is work related. *Emmons v. Southern Pacific Transportation Co.*, 701 F.2d at 1119, *citing, Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). In *Emmons*, the Fifth Circuit found that the trial court was correct in specifically focusing on the injured worker's awareness of his injury to determine whether the claim was time barred. 701 F.2d at 1120, n. 8. The trial court record showed plaintiff's testimony that he was aware of his problem and that it was work related. *Id.* Likewise, Crisman admits in his deposition that he only had problems at work and with specific substances, but he nevertheless maintains that he did not know the problems were work related. Thus, the question becomes whether Crisman should be allowed to ignore what appears to be obvious signs of trouble. This Court finds that he should not. Crisman's deposition is replete with testimony that indicates that he was aware or should have been aware of his illness. Unlike *Urie v. Thompson, supra*, where the Supreme Court refused to find that the FELA limitations period was enacted by Congress to charge innocent plaintiff with knowledge of an undetected and unnoticed injury, on these facts, the Court finds that Crisman had knowledge of both his injuries and their cause. Like the facts in *Clay*, Crisman's deposition reveals that he knew or had a reasonable opportunity to discover the cause of his injury. Although Crisman disputes that his condition began in 1963, it is undisputed that Crisman's symptoms increased in either

1983 or 1984. Using the latest date for the increase in symptoms, the Court finds that Crisman's cause of action accrued in 1984 when he noticed an increase in his long-standing problems caused by exposure to paint fumes. The prescriptive period has run, and Crisman's claims are prescribed.

## V. CONCLUSION

The wealth of Fifth Circuit jurisprudence makes clear that, like *Albertson, Hagerty* and *Clay,* Crisman's cause of action, if any, accrued at the time of his alleged exposure to the "toxins." Crisman admitted in his deposition that he knew that his exposure to paint fumes caused him headaches and the other ailments from which he allegedly suffered. Crisman admitted in his deposition that he knew *at the time of exposure* that these substances caused the physical problems complained of. Crisman admitted in his deposition that he complained to his supervisors and co-workers about the effects the substances had on him. Crisman admitted in his deposition that these physical problems occurred only while he was at work and resolved when he was at home, just as in *Clay, supra,* Crisman admitted that he experienced these problems on "virtually every hitch" that he worked for ODECO (Deposition, p. 56). Further, Crisman's physician informed him that he suffered from a contact-type allergy which was aggravated by reaction causing substances. All these facts point to one conclusion: Crisman knew or should have known that the various substances caused his alleged physical problems and ailments. Crisman had actual or constructive knowledge of both the effects of his exposure and the relationship of that exposure to his claimed ailments. Therefore, Crisman had knowledge of the "critical facts" of his injury and his cause of action accrued at the time of exposure.

Although Crisman's physician informed him in 1979 that work place toxins may have caused his problems, the Court will use the latest year identified in Crisman's insurance claim forms as the onset of his illness. Thus, Crisman's cause of action accrued in 1984. At the latest, Crisman would have had to file his lawsuit by the end of 1987 in order to assert a timely claim under the Jones Act. Crisman filed suit on September 12, 1988. These claims come too late and, therefore, must be DISMISSED.

Crisman's general maritime law claims for unseaworthiness and maintenance and cure must, likewise, be DISMISSED. Those claims are, like Crisman's Jones Act claims, subject to the three-year prescriptive period. 46 U.S.C. § 763(a). Because suit was not timely filed within the statutory limitation, those claims are time barred.

Crisman's hearing loss claim has also prescribed. Crisman readily admitted in his deposition that he was aware of his hearing loss as early as 1973 (Deposition, pp. 122–123). Further, the medical records of Dr. Sagrera clearly show that Crisman's hearing loss was known and stable in 1979 (Exhibit "E" to Defendant's Motion for Summary Judgment). Crisman admitted that he knew of the relationship between this hearing loss and his employment. Accordingly, there is no question but that Crisman's cause of action for any hearing loss accrued to him by 1973 or, at the latest, 1979. Having not filed suit until 1988, Crisman's claims have prescribed.

Patricia Crisman has asserted a claim for loss of consortium arising out of her husband's injuries. Mrs. Crisman's claims are dependent on her viability of her husband's claims. Therefore, because his claims have prescribed, so have Mrs. Crisman's. Accordingly, the claims of Mrs. Crisman must also be DISMISSED as time barred.

In sum, the Court finds that William Crisman had knowledge of his injuries because the injuries were perceptible and because the injuries were manifested in an appreciable manner. Accordingly, defendant's Motion for Summary Judgment is GRANTED and plaintiffs' claims are DISMISSED as time barred.