# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-40622

HERBERT B. PRETUS, JR.,

Plaintiff - Appellant,

v.

DIAMOND OFFSHORE DRILLING INC.; DIAMOND OFFSHORE
MANAGEMENT  CO.; DIAMOND OFFSHORE SERVICES CO.,

Defendants - Appellees.

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS, SMITH, and OWEN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

On September 6, 2006, Plaintiff Herbert B. Pretus, Jr. ("Pretus") sued his employer, Diamond Offshore Drilling Inc., and related entities (collectively, "Diamond"), after being diagnosed in early 2005 with a lung disorder allegedly arising out of his employment on the *OCEAN CONFIDENCE* and other movable ocean rigs owned by Diamond.  Diamond filed a motion for partial summary judgment in which it argued that the suit was time-barred.  The district court granted the motion and entered a final judgment dismissing all of Pretus's claims.  Because we find that genuine issues of material fact remain as to when Pretus should have discovered his medical condition so as to trigger the applicable statute of limitations, we reverse and remand.

## I. FACTS AND PROCEDURAL BACKGROUND

Pretus began working for a predecessor to Diamond in 1978 as a roustabout. Initially Pretus was part of a crew that worked aboard a submersible drilling rig, but Diamond soon assigned him to the safety department. Thereafter Pretus worked on submersible drilling rigs as a safety representative. From February 4, 1999 through 2000, Pretus was assigned to work on the *OCEAN CONFIDENCE*, a floating hotel, during the time it was being retrofitted into an offshore drilling rig. While on the *OCEAN CONFIDENCE*, Pretus assisted in cleaning the rig, which was allegedly wet and moldy.

Pretus served 14 day hitches on the rig, followed by 14 days off duty during which he returned home. During one of his early hitches, Pretus began having respiratory problems. He had "cold-like" symptoms: a cough, fever, aches, congestion, and chest tightness. The symptoms usually improved when Pretus returned home but frequently returned during his next hitch, though Pretus did have some hitches without symptoms.

Other workers on the rig experienced similar ailments, and the symptoms became known as the "Confidence Crud." Pretus, as safety representative, called doctors engaged by Diamond to seek treatment advice when he or other members of the crew were ill. Diamond had "standing orders" in place on the rig for any employee who had respiratory problems to take medications such as antibiotics and antihistamines, and Diamond provided flu shots and pneumonia shots to any employee who requested them. Pretus took a variety of such medications for his ailments, which usually alleviated his symptoms.

In January 2001, Diamond promoted Pretus to the position of safety supervisor. As a safety supervisor, Pretus worked out of Diamond's headquarters in Houston but his duties required him to occasionally visit

offshore rigs to supervise safety representatives. The parties dispute the frequency and duration of these trips.

While working as a safety supervisor, Pretus continued to periodically suffer from these cold/flu-type symptoms. He was treated by his personal physician, Dr. Michael Ellis, an ear, nose, and throat specialist in Chalmette, Louisiana, on at least one occasion. Dr. Ellis diagnosed Pretus as suffering from bronchitis. Pretus was also treated by Dr. Phillip Weinstein in Houston, Texas. After a few years, Pretus's symptoms worsened, and in July of 2004 he took a leave of absence due to his severe shortness of breath and coughing. He then went to see a pulmonologist, Dr. Joe Johnson, who treated him for a few months and then referred him to an infectious disease specialist, Dr. Michael Hill. In January of 2005, Dr. Hill advised Pretus that he might have a fungal infection in his lungs.

In March of 2005, Diamond's insurer sent Pretus to Dr. James Patterson for an independent medical examination. After Dr. Patterson conducted his examination he diagnosed Pretus with hypersensitivity pneumonitis. Dr. Patterson's independent medical report, submitted by Pretus in opposition to Diamond's motion for partial summary judgment, described the condition as

> an immune/allergic disease of the lung caused by environmental exposure to antigen(s), with Farmer's Lung being the prototype. Initially, the symptoms resemble a respiratory tract infection, and it is commonly misdiagnosed, as the symptoms are similar with [sic] fever, cough, body aches, headache, chest congestion or tightness. Symptomatic treatment can resolve the symptoms in the early stage of the disease. Mr. Pretus'[s] symptoms followed this pattern. If it is recognized that the symptoms are recurring on exposure, and resolving away from the exposure, the condition can be completely cured by avoiding the exposure altogether.
>
> If the early stage of [hypersensitivity pneumonitis] is not recognized, the condition worsens and progresses with chronic cough, shortness of breath with exercise, and abnormal changes on

pulmonary function tests, chest x-ray, and CT scan. Fibrosis of lungs develops, especially in the lower lobes and the condition becomes fixed with irreversible loss of lung function. Mr. Pretus's course followed this pattern. He has fibrosis of lower lungs on high resolution CT and chest x-ray with similar interstitial changes in lungs.

* * *

The tragedy of this condition is that it is preventable by early recognition and removal from exposure. However, many times it is missed and treated as multiple respiratory infections and the chronic irreversible stage develops. The system that was in place at the job site with "standing orders" to dispense medication on site for respiratory infections probably covered up the diagnosis, delayed recognition, and contributed to the development of the chronic problem of Mr. Pretus.

When Pretus received this diagnosis, he sued Diamond in Texas state court on September 6, 2006 under the Jones Act and general maritime law. Diamond removed the case to federal district court in October 2006. In March 2007 Diamond filed a motion for partial summary judgment in which it argued that Pretus's Jones Act and general maritime law claims are barred by the three year statute of limitations and that his only remedy lies under state worker's compensation laws. The district court granted the motion, apparently on the ground that the suit was time-barred, and entered a final judgment dismissing all of Pretus's claims. From this judgment Pretus appeals.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had diversity jurisdiction under 28 U.S.C. § 1332 and admiralty jurisdiction under 28 U.S.C. § 1333. We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

"We review the district court's grant of summary judgment *de novo*, applying the same standard as the district court." *Envtl. Conservation Org. v.*

*City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008) (citing *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 841 (5th Cir. 2007)). *See* FED. R. CIV. P. 56.

## III. LAW AND ANALYSIS

The dispositive issue on appeal is whether a genuine issue of material fact exists as to when Pretus should have discovered his illness so as to trigger the running of the three year statute of limitations for his Jones Act and general maritime law claims. If they began to run more than three years prior to his filing suit on September 6, 2006, the district court properly dismissed the suit as untimely; if they began to run within that three year period, the suit was timely and should not have been dismissed on that basis.

The statute of limitations for maritime torts is governed by 46 U.S.C. § 30106 (previously 46 U.S.C. app. § 763a): "Except as otherwise provided by law, a civil action for damages for personal injury or death arising out of a maritime tort must be brought within 3 years after the cause of action arose." The Jones Act, 46 U.S.C. § 30104 (previously 46 U.S.C. app. § 688), adopts the same statute of limitations applicable to suits under the Federal Employees' Liability Act ("FELA"), 45 U.S.C. § 56, which is three years. Pretus filed his lawsuit on September 6, 2006. Therefore, his suit is only timely if his cause of action accrued on or after September 6, 2003.

### *Discovery Rule*

"A cause of action under the Jones Act and general maritime law accrues when a plaintiff has had a reasonable opportunity to discover the injury, its cause, and the link between the two." *Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir. 1991) (citing *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984)). One of the early cases establishing the framework for this rule is *Urie v. Thompson*, 337 U.S. 163 (1949), where a worker inhaled silica dust over

the course of thirty years of work but became aware of an injury—a related occupational disease, silicosis—only after his symptoms became so severe he became unable to work and was diagnosed with silicosis. *Id*. at 165-66. His employer tried to defend under FELA's three year statue of limitations,[1] but the court rejected the defense, saying that the statute of limitations was not meant to apply to facts that were "unknown and inherently unknowable." *Id*. at 169. This rule, that the statute of limitations is not triggered under certain conditions when the employee does not know of his injury or illness, came to be known as the discovery rule.

This case and others were examined in *Albertson*, the leading Fifth Circuit case on Jones Act and general maritime law statute of limitations. The plaintiff, Albertson, was forced by his employer to use a dangerous chemical, trichloroethylene ("TCE"), throughout a four-month voyage aboard a freighter which ended in 1969. 749 F.2d at 226–27. During the voyage, Albertson began blacking out and experiencing excruciating headaches and nausea. *Id*. at 227. Upon returning to land, he was hospitalized, and although the doctors apparently failed to advance a definitive diagnosis, they refused to certify him to return to sea. *Id*. His health continued to decline, and in 1980 he was allegedly informed for the first time of a link between his TCE exposure and his mental and physical problems. *Id*. at 227–28. He sued his former employer under the Jones Act and general maritime law in 1981, more than 12 years after the exposure. *Id*. The district court granted summary judgment in favor of the employer on the ground that the suit was time barred. *Id*.

---

[1] FELA and the Jones Act have a strong connection. *See Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 301 n.2 (5th Cir. 2008) ("The Jones Act, 46 U.S.C. § 30104, makes the provisions of the Federal Employers' Liability Act . . . applicable to seamen. Jones Act cases, therefore, follow cases under FELA.").

On appeal, we discussed the legal principles governing the timeliness of this action:

> It is generally accepted that a cause of action for a tort accrues when there has been an invasion of the plaintiff's legally protected interest. *See* Restatement (Second) of Torts § 899 comments c & e (1977). Ordinarily, this invasion occurs at the time the tortious act is committed. *Id.*; *DuBose v. Kansas City Southern Railway*, 729 F.2d 1026, 1028 (5th Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 113 (1984). If some injury is discernible when the tortious act occurs, the time of event rule respecting statutes of limitations applies, and the plaintiff's cause of action is deemed to have accrued. If the plaintiff later discovers that his injuries are more serious than originally thought, his cause of action nevertheless accrues on the earlier date, the date he realized that he had sustained harm from the tortious act.
>
> In some cases, however, the injured person may not realize that a tort has been committed upon his person, since he may sustain a latent injury which either is not or cannot be discovered until long after the tortious act that caused the injury has occurred and after the applicable statute of limitations otherwise would have run. In such a case, courts have routinely applied the so-called discovery rule to toll the running of the statute of limitations. When the discovery rule applies, the plaintiff's cause of action does not accrue on the date the tortious act occurred, but on the date the plaintiff discovers, or reasonably should have discovered, both the injury and its cause.

749 F.2d at 228–29 (footnote omitted).

The court characterized the latter situation—where the employee does not discover the latent injury until long after the tortious act occurs—as "the pure latent injury case." *Id.* at 229. Many occupational diseases are examples of pure latent injuries, the hallmark of which is that "the plaintiff fails to discover either the injury or its cause until long after the negligent act occurred." *Id.* at 230. Under *Urie*, the discovery rule applies to such claims based on the principle that plaintiffs should not be victimized if they had no knowledge or indication they were injured. *Id.* at 231.

We contrasted the pure latent injury case with another situation, where the injury is immediately apparent but worsens over time; we labeled this as "the traumatic event/latent manifestation case." In such cases, "the plaintiff has sustained both immediate and latent injuries caused by a noticeable, traumatic occurrence. At the time of the traumatic event, the plaintiff realizes both that he is injured and what is responsible for causing the injury. The full extent of the harm, however, has not become manifest." *Id.*

In *Albertson*, we held that the plaintiff's injuries fell under the traumatic event/latent manifestation line of cases because "at the time he endured the last exposure to the TCE . . he suffered serious damage and noteworthy injury, and he knew the injury was significant." *Id.* at 233. We further explained:

> This is not a case in which, coinciding with the trauma, an injured seaman experienced and noticed only a minor injury and at a later time discovered an unexpected latent injury that was unknown and unknowable at the time of the traumatic event. *C.f., Marathon Oil Co. v. Lunsford*, 733 F.2d 1139, 1142 (5th Cir.1984). Albertson had knowledge of his injuries at the time he was injured, and he soon knew they were substantial. His lack of knowledge of all the claimed consequences of his injury does not justify a departure from the time of event rule which establishes that the statutory limitations period began to run at the time of the trauma.

*Id.*

Later cases have continued to draw the distinction between pure latent injury cases and traumatic event/latent manifestation cases, but the analysis often depends on the facts. In *Clay v. Union Carbide Corp.*, 828 F.2d 1103 (5th Cir. 1987), for example, the plaintiff, Clay, was exposed to toxic chemicals and thereafter suffered significant symptoms including "laryngitis, difficulty breathing, nausea, burning eyes, headaches, bronchitis, memory loss, mental confusion, dizziness, prostate gland trouble, erratic heartbeats, sinus congestion, and a productive cough." *Id.* at 1105. These ailments only occurred when he worked around the chemicals, not while he was away on other jobs or at home.

*Id.* Approximately eight years after changing jobs to get away from the chemicals, Clay was diagnosed with "chronic respiratory complaints," and he sued his employer under the Jones Act and general maritime law. The district court granted summary judgment in favor of the employer on the basis of untimeliness.

On appeal, Clay argued that his various ailments only constituted "minor physical ailments, . . . [as] distinguish[ed] from Albertson's severe headaches and blackout spells." *Id.* at 1106. Specifically,

> Clay argu[ed] strongly that when a worker suffers minor physical annoyances, such as headaches, transient dizziness, or congestion that he causally connects to his work environment, such knowledge should not be considered an invasion of a legal interest sufficient to start the statute of limitations running against him thereby precluding suit when he is later found to be suffering from a serious occupational illness.

*Id.* at 1106–07. We specifically noted that "Clay's argument has merit and is not foreclosed by *Albertson*" based on the above quoted passage. *Id.* at 1107. However, Clay's injuries were "virtually identical" to his eventual diagnosis of "chronic respiratory complaints"; therefore "Clay possessed or had reasonable opportunity to discover the critical facts *of the injury he claims to have suffered*." *Id.* (emphasis added).

Likewise, in *Crisman*, the plaintiff, Crisman, sued his employer after sustaining "a hearing loss, a chemical toxicity disorder, and respiratory injuries" after exposure to petroleum-based chemicals at work. 932 F.2d at 414. However, Crisman admitted in deposition testimony that he knew at the time of exposure to the chemicals—more than a decade prior to filing suit—that his exposure had caused those conditions, and he complained to his employer and co-workers at the time. *Id.* at 416. The record was replete with other evidence and testimony that Crisman had known of those conditions and their cause well over three years before filing suit. *Id.* at 414–17.

Crisman argued that the issue of timeliness was one for the factfinder and should not have been decided on summary judgment, but the argument was foreclosed because the material facts were not in dispute. "While evaluating when a plaintiff reasonably was put on notice ordinarily is a factual determination, in this case there was such an overwhelming array of evidence indicating that the case was time-barred that summary judgment was appropriate." *Id*. at 417 n.4. Consequently, under the three year statute of limitations, we held that the suit was time-barred. *Id*. at 418.

Finally, in *Taurel v. Central Gulf Lines, Inc*., 947 F.2d 769 (5th Cir. 1991), the plaintiff, Taurel, had worked as a merchant seaman since 1958. *Id*. at 770. He had "complained of pulmonary and respiratory difficulties" throughout his career and had visited a hospital in 1963 and 1965 complaining of difficulty in breathing. *Id*. From 1975 to 1981, chest X-rays taken during routine physicals were declared normal, and in 1984 he was treated for bronchitis but was not diagnosed with anything more serious. *Id*. In 1987 Taurel was diagnosed with asbestosis as a result of a routine screening test conducted in 1986 or 1987. *Id*. at 771.

Taurel sued his employer in 1988 under the Jones Act and general maritime law, but the district court granted summary judgment in favor of the employer based on untimeliness. *Id*. It found that Taurel's cause of action had accrued in 1980 based on Taurel's deposition testimony that fellow seamen and a doctor had informed him no later than 1980 that his problems might be related to asbestos. *Id*. at 771–72.

On appeal, we addressed the "critical question" of when Taurel's cause of action accrued, finding that it did not accrue until a physician actually diagnosed Taurel with asbestosis in 1987; thus, his 1988 suit was timely. *Id*. at 771. We found particular significance in the fact that Taurel had been to various doctors who did not make findings consistent with asbestosis and failed to diagnose

asbestosis. *Id.* at 772. We concluded that a genuine issue of material fact remained as to when Taurel "discovered, or should have discovered, that he had asbestosis," and that the district court erred in concluding that the suit was time-barred under the three-year statute of limitations. *Id.*

## *Analysis*

The above cases focus on several considerations: first and foremost, the severity of the traumatic event and initial symptoms; second, the plaintiff's correlation of his ultimate injury with the traumatic event; and third, the plaintiff's reasonable reliance on the opinions of medical experts.

The first consideration, the severity of the traumatic event and initial symptoms, is illustrated by *Albertson*, where exposure to a dangerous chemical caused excruciating headaches, blackouts, and nausea; and *Clay*, where exposure to toxic chemicals caused both moderate and severe symptoms, including memory loss, prostate gland trouble, and erratic heartbeats. Where the event is not particularly traumatic and the initial symptoms are not severe, such that the plaintiff did not discover and should not have discovered the latent injury until later, the discovery rule may apply, as illustrated by *Taurel*. Indeed, even *Clay* acknowledged that "routine physical annoyances" that are "causally connect[ed] to [an employee's] work environment" do not necessarily trigger the running of the statute of limitations. 828 F.2d at 1106–07.

It is undisputed that Pretus had medical problems that related to his work on the *OCEAN CONFIDENCE* and, perhaps, other vessels. Unlike in *Albertson* and *Clay*, viewing the facts in the light most favorable to the nonmovant, Pretus, there was no discrete traumatic event like a chemical exposure, and the contemporaneous symptoms were not severe. Pretus submitted an affidavit in opposition to Diamond's motion for partial summary judgment in which he referred to having "cold-type symptoms including a sore throat, fever, sinus

pressure, coughing, and nose congestion" during his time aboard the *OCEAN CONFIDENCE* in 1999 and 2000.

Pretus's characterization of the symptoms as "cold-type" is supported by two "Injury or Illness Reports" filled out by him in 2000 and submitted by Diamond in support of its motion. In a March 1, 2000 report, Pretus complained of a head cold, running a low-grade fever, a headache, and body aches. In a May 25, 2000 report, he complained only of a low-grade fever, body aches, and a cough. Neither report states a cause for those symptoms.

Until 2004, the only diagnoses his physicians gave him were common illnesses such as colds, sinus infections, and bronchitis. His symptoms improved with antihistamines and antibiotics, which could have led him to believe that the physicians had correctly diagnosed his malady. Nothing about those symptoms necessarily suggests a serious illness like the cases discussed above. A factfinder could classify them as "routine physical annoyances" under *Clay*, 828 F.2d at 1106–07.

Under the second, related consideration, the plaintiff's correlation of his ultimate injury with the traumatic event, it is significant that Pretus is not suing based on those initial symptoms. This case therefore differs from *Clay,* where the plaintiff's eventual diagnosis of "chronic respiratory complaints" simply encompassed his initial symptoms that were manifested more than three years prior to suit; and *Crisman,* where the plaintiff's suit was based on hearing loss and other conditions that he knew about for more than three years prior to filing suit. Thus, a factfinder could conclude that it does not matter that Pretus could correlate a cold, sinus infection, or bronchitis to his workplace. Those are short-term afflictions that disappear with treatment, and according to his summary judgment evidence that is essentially how his symptoms behaved until 2004. In short, under the first two considerations, there is a genuine issue of

material fact as to the existence of a traumatic event and the severity of Pretus's symptoms prior to 2004.

The third consideration, the plaintiff's reasonable reliance on the opinions of medical experts, is best illustrated by *Taurel*. There, we held that a plaintiff's cause of action did not accrue until he was actually diagnosed with asbestosis, when earlier medical screenings and treatment for bronchitis and other pulmonary ailments had failed to uncover the condition. Even though doctors and coworkers previously suggested to the plaintiff that his problems might be related to asbestos, only the eventual diagnosis provided notice that his condition was something more serious than a routine ailment.

This case is analogous to *Taurel*, in that both involved pulmonary conditions caused by long-term exposure to an airborne irritant or agent, and in both cases medical experts' initial diagnoses failed to identify a serious condition. Pretus diligently sought help for his medical problems, both while he was suffering from minor symptoms in 1999 and 2000, and a few years later when he developed a more serious pulmonary disability. He was initially diagnosed with nothing more serious than bronchitis because the symptoms at the time did not indicate to Pretus's physicians that he had a serious disease. In 2004, when treatment for colds, sinus infections, and bronchitis failed to alleviate his increasingly severe and debilitating symptoms, Pretus took a leave of absence to seek further treatment.

Only in 2004 and 2005 did doctors finally determine that Pretus had a serious illness, one that was entirely different from bronchitis. After extensive testing, including high resolution CT scans, were his physicians first able to diagnose his condition as "chronic interstitial lung inflammation," permanent "fibrosis (scarring) of his lung tissue," and hypersensitivity pneumonitis. The independent medical report of Dr. Patterson, which was submitted by Pretus in opposition to Diamond's motion, fully supports Pretus's version. Dr. Patterson's

report explains that the condition is difficult to diagnose and is often misdiagnosed in the early stages.[2] Pretus obtained these diagnoses less than three years before he filed suit. If the factfinder concludes that Pretus could not have reasonably discovered that he had a serious illness before 2004, the 2006 suit is timely under the Jones Act and general maritime law statute of limitations.

Based on Pretus's affidavit, the reports he filled out in 2000, his diagnoses from various physicians, and Dr. Patterson's report, a reasonable person could conclude: (1) his early symptoms suggested nothing more serious than the common cold, sinus infections, bronchitis and the like; (2) these ailments are the type of "minor physical annoyances" mentioned in *Clay* that do not trigger the running of a limitations period even if Pretus "causally connect[ed] [the ailments] to his work environment," 828 F.2d at 1106; and (3) Pretus's cause of action therefore did not accrue until after September 6, 2003.

We therefore conclude that a jury question is presented as to when Pretus reasonably should have discovered that he was suffering from a serious medical condition, and the district court erred in granting summary judgment in favor of Diamond.

## IV. CONCLUSION

For the above reasons, the district court's judgment dismissing Pretus's suit is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.

---

[2] The report also suggests that Diamond's own "standing orders" to treat the respiratory ailments probably contributed to the failure to discover and prevent the development of Pretus's hypersensitivity pneumonitis.

JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent. This case is relatively easy. This court established a bright-line rule in *Crisman v. Odeco, Inc.*, 932 F.2d 413 (5th Cir. 1991), under which the statute of limitations has run on Pretus's claim. End of story, affirm Judge Heartfield's decision to grant summary judgment.

The panel majority, however, ignores the rule altogether. Instead, it decides the case on a variety of "considerations," which, before now, had never been announced or even suggested. This directly violates our rule of orderliness, which mandates that *Crisman*'s bright-line standard governs. In addition, the majority deeply confuses the important factors we examine when determining whether to toll limitations, and it mischaracterizes what constitutes a "traumatic event."

## I. Rule of Orderliness and *Crisman*

In *Crisman*, as here, the plaintiff worked on an oil rig, spending one week at work then one at home. *Id.* at 417. While on the rig, he "experienced headaches and a burning sensation in his respiratory passages that did not abate until he returned home. . . . [T]he welding fumes caused headaches and sinus problems that again would abate when he returned home." *Id.* at 414. "Crisman states in his deposition that these symptoms occurred *only* at work and disappeared when he left work for extended periods of time . . . ." *Id.* at 416. "Crisman experienced these problems *almost every time* he went to work." *Id.*

We squarely held that this pattern of being sick while at work and feeling better while at home[1] "should put a plaintiff on notice that he has suffered an injury." *Id.* (*citing Clay v. Union Carbide Corp.*, 828 F.2d 1103, 1107 (5th Cir.

---

[1] I call this the "pattern of illness."

1987)).

> Crisman would spend one week at work, become ill, return home for one week, and recover. He may have had a valid cause of action then, but he did not pursue it. *This was fatal* for, once a plaintiff should reasonably have been aware of the critical facts of injury and causation, he must bring suit.

*Id.* at 417 (footnote, internal quotation marks, and citation omitted) (emphasis added). This bright-line rule was based on *Clay*, 828 F.3d at 1107, in which a plaintiff's knowledge that "his symptoms were worse when he was around the chemicals" put him on notice to sue.

Pretus's symptoms are not reasonably distinguishable from those in *Crisman*. In deposition he stated,

> It would act like a cold. It would, you would cough and you'd get tightness in your chest and you'd get, you'd cough up some clear phlegm and then it turned yellow phlegm and then turn to green phlegm and if, if you don't get out of your system, you start a fever . . . . Towards, towards the end of the hitch and you'd go home and you'd get well at the house and you'd come back and start all over again.

Pretus's medical report confirms that "[h]e would be well on return home, but have symptoms when he went back to the rig." The evidence is undisputed: Pretus suffered from same pattern of illness that we examined in *Crisman*.

Our rule of orderliness "forbids one of our panels from overruling a prior panel." *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999). We have only three options. First, we could find that Pretus does not fall under the rule. As discussed above, this is impossible, because his facts are materially indistinguishable[2] from those in *Crisman*. Second, we could find that *Crisman* itself violated our rule of orderliness, and some earlier precedent forbids this bright-line test. This too cannot be done, however, because in *Crisman* we re-

---

[2] Pretus's precise illness may differ from the plaintiff's illness in *Crisman*, but the pertinent fact—the pattern of illness—is indistinguishable.

16

lied on a rule promulgated in *Clay*, and there is no language in any of our earlier cases forbidding this bright-line rule.[3] The third, final, and only proper and available option is to apply the *Crisman* test, find it is "fatal"[4] to Pretus's claim, and affirm.

Instead, however, the majority completely ignores the test and our rule of orderliness and decides the case based on "considerations," using a definitive list that no previous court has *ever* found to be controlling. Although it would be fair in many circumstances to debate whether a bright-line rule or a factor-based test would be preferable in these pattern-of-illness cases, that debate already took place in *Crisman*—the bright-line rule won.

All that the majority opinion will do is generate more litigation of this case in district court. But in the end, the same rule of orderliness that the majority ignores will ensure that *Crisman*'s bright-line rule continues to govern even after this case is decided. *Crisman* controls, and our rule of orderliness mandates that Judge Heartfield's judgment be affirmed.

## II.  The Majority's "Considerations"

Even if this case were to be decided based on some kind of balancing test, the majority errs in identifying the "considerations"—better referred to as factors—that it claims governs Jones Act limitations cases. To begin, the majority essentially fabricates these considerations in a way that meets Pretus's requirements, picking from earlier cases a variety of "rules" that leads to a reversal of

---

[3] In addition, in the eighteen years since *Crisman* was decided, it has never been questioned by this court. It has, however, been cited favorably by several panels. *See, e.g., Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 988 (5th Cir. 1998); *Bealer v. Mo. Pac. R.R. Co.*, 951 F.2d 38, 40 (5th Cir. 1991).

[4] *Crisman*, 932 F.2d at 417.

17

the judgment.[5] Because I fear that later panels and parties will rely on these stated factors and confuse the state of the law, I briefly discuss how they are flawed.

The majority's first consideration is "the severity of the traumatic event and initial symptoms." Although that is a factor to be examined by any court in similar cases, the majority's statement of the rule is seriously mistaken. It establishes much too high a bar for the severity of injuries. Admittedly, some of our earlier cases have featured plaintiffs with rather serious symptoms, such as memory loss in *Clay* and blackouts in *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 227 (5th Cir. 1984). But life-threatening or critical injury is not required to put a putative plaintiff on notice. In *Crisman*, the plaintiff did not black out or have memory loss but only had "headaches and respiratory problems." *Crisman*, 932 F.2d at 414.

Pretus's symptoms are not as serious as those in *Clay* or *Albertson* but are easily comparable to those in *Crisman*. Although the majority attempts to portray Pretus as having mere "cold-like symptoms," it ignores the severity of those symptoms and fails to mention how Pretus coughed up multi-colored phlegm and had significant chest tightness. A minor sore throat or a couple days' runny nose may not put a plaintiff on notice, but Pretus's symptoms crossed the "minor physical annoyance" line, *see Clay*, 828 F.2d at 1106, that we have established.

Once this barrier is crossed, severity of symptoms is only a part of our analysis. More serious symptoms such as blackouts and memory loss will make it more likely the plaintiff should have been on notice, but suffering from less serious symptoms will not guarantee that he qualifies for the discovery rule.

The majority's next consideration is "the plaintiff's correlation of his ulti-

---

[5] I do not suggest that the majority is result-oriented in its methodology. The fact is, however, that the way in which the majority fashions its "considerations" is considerably tilted to Pretus's benefit.

mate injury with the traumatic event." The majority claims that if a plaintiff is suing on symptoms different from the ones from which he initially suffered, limitations is tolled.

This is in direct contradiction to our earlier cases. In *Albertson*, 749 F.2d at 232, the plaintiff argued that limitations were tolled because initially he had suffered from headaches and blackouts, but he was suing based on later-developed ailments such as "blisters[,] . . . his liver ailment, behavioral disorder, and other psychological problems." We rejected that defense, recognizing that what matters is not when the plaintiff recognized his later-developed, more serious symptoms, but instead when he notices his first symptoms that gave him "a reasonable opportunity to discover the critical facts of his injury." *Id.* at 233.

Thus, Pretus may not have discovered the extent of his injuries until later, but the fact that he should have been on notice from his pattern of illness means that limitations were not tolled. This consideration, as identified and applied by the majority, is inapposite and not a part of any proper Jones Act limitations analysis.

The majority's final consideration is "the plaintiff's reasonable reliance on the opinions of medical experts." The majority holds that if a plaintiff has seen a doctor and has been given a clean bill of health, limitations are tolled until he is diagnosed. This court, however, has flatly and repeatedly rejected that rule.

In *Albertson*, we described how the plaintiff met with numerous doctors, none of whom diagnosed his condition. *Id.* at 227-28. He was finally diagnosed by a doctor more than a decade after he had first seen a physician regarding his symptoms, and he sued immediately after that diagnosis. We nonetheless held that the statute of limitations had run.

Similarly, in *Clay*, the plaintiff had met with doctors to discuss his illness but was not diagnosed until years later. *Clay*, 828 F.3d at 1105. He too sued immediately, and again this court found that even though his final diagnosis was

made only a month before he sued, limitations had run. *Id.*

To prove its stated rule, the majority relies on only one case, *Taurel v. Central Gulf Lines, Inc.*, 947 F.2d 769 (5th Cir. 1991). *Taurel*'s holding, however, is not in conflict with Judge Heartfield's finding that Pretus's suit is time-barred. In *Taurel*, the plaintiff was tested for asbestos-related problems, but his tests were negative; later, he was diagnosed with asbestosis. *Id.* at 770-71. This court held that limitations had not run. *Id.* at 772. That decision, however, was informed by unique circumstances: Taurel had been tested for the same disease with which he was eventually diagnosed. He could not have been any more vigilant.

Pretus may have visited a physician during his time on the vessel, but he was not vigilant enough to get tested for his eventual disease based on his pattern of illness. His doctors' notes clarify that the only way to diagnose hypersensitivity pneumonitis ("HP") is by finding the kind of pattern Pretus suffered from. Had he approached a doctor, described the pattern to seek treatment for HP, and been told he was not suffering from the disease, this case would then be governed by *Taurel*, and limitations would be tolled. That is not, however, what happened to Pretus, so the discovery rule does not apply.

As I have shown, the majority's "considerations" are deeply flawed. The first overstates the test for serious injury, and the second and third have been flatly rejected by earlier precedent.

### III. The "Traumatic Event"

Finally, the majority errs in the way it uses the phrase "traumatic event." The majority claims that limitations have not run in this case in part because Pretus has not experienced a "discrete traumatic event." That conclusion, however, confuses what we require for a traumatic event.

In *Albertson*, this court coined the "traumatic event" phrase to describe

when a plaintiff should be on notice about his injury; we used the label to discuss *Beech v. United States*, 345 F.2d 872 (5th Cir. 1965)––in which the plaintiff had slipped on a floor in a government building––and then applied the label to the situation at bar. *Albertson*, 749 F.2d at 231-32. The majority's new notion––requiring a "discrete traumatic event" to trigger the running of limitations––apparently derives from cases such as *Beech*. Indeed, when one thinks of a traumatic event, one pictures something like a fall (as in *Beech*) or an explosion or plane crash.

For our purposes, however, "traumatic event" is not a single spectacular event, but instead merely an occurrence or series of events that leaves the plaintiff on notice of his injury. Slipping on a floor would qualify, but so would severe headaches after months of breathing toxic fumes. Whether that event was, in fact, "traumatic" is of little help, except to the degree that a truly traumatic event is more likely to put a plaintiff on notice.

Our caselaw requires this reading of the phrase. In *Albertson*, the plaintiff periodically experienced blackouts and severe headaches and suffered from nausea throughout the voyage. *Albertson*, 749 F.2d at 226-27. This was not one traumatic event, but several minor ones combined with voyage-long symptoms. In *Clay*, the plaintiff suffered from chemical exposure that occurred constantly while he worked on his barge; again, there was no one single traumatic event. *Clay*, 828 F.2d at 1104-05. The same kind of injury occurred in *Crisman*, where the plaintiff incurred his injuries after years of inhaling fumes. *Crisman*, 932 F.2d at 414. These cases prove that there does not need to be one specific, traumatic event that leads to injury, but only enough to put the plaintiff on notice that he had been or was being harmed.

This case is surprisingly simple. *Crisman* created a bright-line rule, Pretus's pattern of illness is identical to the one in *Crisman*, and therefore we must affirm the summary judgment. *Crisman* and its bright-line rule can be over-

turned by this court only by en banc vote, a Supreme Court decision, or legislation, not by a panel's blindness to a governing case.

Our rule of orderliness does not permit a panel majority to dodge a controlling test altogether. Judge Heartfield correctly granted summary judgment and should be affirmed. I respectfully dissent.